711 So.2d 651 (1998)
STATE of Louisiana
v.
Ricky Joseph LANGLEY.
No. 95-KA-1489.
Supreme Court of Louisiana.
April 14, 1998.
Order Granting Rehearing in Part June 19, 1998.
*656 Clive Adrian Stafford Smith, R. Neal Walker, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Robert R. Bryant, Dist. Atty., Paul P. Reggie, Vernon E. McGuire, III, Lake Charles, for Respondent.
CALOGERO, Chief Justice.[*]
On July 9, 1994 a jury in the 19th Judicial District Court East Baton Rouge Parish, convicted the defendant, Ricky Joseph Langley, of first degree murder for strangling six-year-old Jeremy Guillory. The jury determined Langley should be sentenced to death, and he was so sentenced by the District Judge, the Honorable Fred Godwin. On appeal to this court, the defendant made numerous arguments based on 24 assignments of error in seeking to have the conviction and sentence overturned.[1] Because we find no reversible error in any assignment, we affirm the conviction and the death sentence.

FACTS
According to the defendant's confession, on February 7, 1992, six-year-old Jeremy Guillory came to the door of the house where the defendant lived as a tenant of the Lawrence family. Jeremy was looking for the Lawrence children, Joy and Joey, who had gone with their parents to visit relatives. The defendant told Jeremy that the Lawrence children were not at home and asked Jeremy if he wanted to come inside. Jeremy said that he did not, but asked when the other children would be back. The defendant invited Jeremy in a second time and Jeremy decided to go inside to wait. He walked in the house, went upstairs to Joy's room and sat down on the floor and started playing. Langley followed Jeremy up the stairs, grabbed him around the neck from behind and strangled him as he kicked and struggled. When Jeremy seemed dead, the defendant took him into the defendant's bedroom and placed him on the bed. He then went up and down the stairs several times. He confessed that he would sit and pet the child's hair.[2]
On one of his trips up the stairs, the defendant thought he heard a noise coming from Jeremy. He took some strong line and wrapped it around Jeremy's neck a few times, pulled it as tight as he could, and then tied it. Because noises still seemed to be coming from Jeremy's body, the defendant stuffed a dirty sock in the dead boy's mouth. The defendant then placed the dead boy in his bedroom closet.
The victim's mother, Lorilei Guillory, called for her son who was outside playing with his BB gun, and received no response. She went to the Lawrence house, where her son often played. Langley answered the door. Ms. Guillory asked Langley if he had seen her son, and he told her no. She left to search for her son, but later returned to the Lawrence house to call 911 to report her son missing. A short time later Langley also made a 911 call and pretended to help Ms. Guillory search for her child. Deputies Thomas Pitre and Ham Reid responded to the 911 call, and with the help of the volunteer fire department and some neighbors, started to search the woods in the area. Later a command center was set up across from the Lawrence residence. A search was conducted throughout the weekend, and when Jeremy was not found by Monday the FBI became involved.[3]
*657 On Monday, the police received information from Elizabeth Clark that there was a convicted child molester named Ricky Langley whose last address was in the area. Clark is a Louisiana parole agent who was attempting to keep track of the defendant, a Georgia parole violator. The police spoke with Ms. Guillory and matched her description of the man she saw at the Lawrence house to Ricky Langley. The FBI discovered an outstanding Georgia parole violation warrant for the defendant. The police obtained a facsimile of the warrant and went to the Fuel Stop 36 where the defendant was working. According to Detective Donald "Lucky" DeLouch, Assistant Chief of Detectives of the Sheriff's Office in Lake Charles, he went to the truck stop with FBI agents Don Dixon and Neal Edwards. When they arrived at the truck stop they spoke with the manager who told them that Langley was working out back on a tractor. Langley was given his Miranda rights and arrested for the parole violation. While Detective DeLouch went inside to get his work records and his coat, Agent Dixon took the defendant to the car.
While waiting in the car, Agent Dixon gave the defendant his Miranda rights again and told him that he was a suspect in the disappearance of Jeremy Guillory. The defendant said that he had heard about it in the news. The agent asked defendant to "look him in the eye" and tell him if he knew anything about the disappearance. The defendant dropped his head and did not answer. Agent Dixon then asked Langley if he had killed Jeremy Guillory and the defendant said that he did it. When Agent Dixon asked where the body was, Langley said that it was in his bedroom closet. Then, without prompting, the defendant explained when and how the murder occurred. When Detective DeLouch came outside, the defendant agreed to sign a consent to search form for his room.
The group went to the Lawrence house. Once there, the officers explained the defendant's rights a third time and presented forms for showing waiver of rights and permission for search and seizure, which Langley signed. In addition, the police obtained consent to search from Ms. Lawrence because it was her home. Finally, the police asked Langley if he would allow them to videotape him as he walked them through the events and showed them where the body was located, and he agreed. After the defendant walked the police through the residence and showed them the body, he was taken to the police station, advised of his Miranda rights a fourth time, and signed another waiver of rights form. He subsequently gave another videotaped confession.
On February 20, 1992, a Calcasieu Parish Grand Jury indicted Langley for first degree murder. He was arraigned on March 2, 1992, at which time he pled not guilty and not guilty by reason of insanity. Due to pre-trial publicity in Calcasieu Parish, this Court ordered venue changed to East Baton Rouge Parish. The case went to trial on June 27, 1994, and on July 9, 1994, the defendant was found guilty of the first degree murder of a person under the age of 12 years.
Jurors rejected the defense of insanity which emerged through the testimony of Dr. Paul Ware, a well-known psychiatrist in Shreveport and an expert in pedophilia and other deviant sexual behavior. Dr. Ware had interviewed the defendant in April of 1994, approximately two years after the crime, and recorded the defendant's statements that he killed Jeremy in the deluded belief that the victim was Oscar Lee Langley, the defendant's dead brother whom he had never known. (Oscar Lee had died with his sister in an automobile accident which also led to a lengthy hospital convalescence of his mother. During her convalescence, she became pregnant with the defendant, though confined in a full body cast at the time.) The defendant told Dr. Ware that Oscar Lee's hallucinatory presence had plagued him throughout his life, and in the days before the murder had urged him to "go ahead and have Jeremy." The defendant said that on February 7, 1992, he had determined to exorcize the demon of Oscar Lee, only to discover that he had killed Jeremy instead. At the completion of the penalty phase, the defendant received the death penalty, and on September 26, 1994 he *658 was formally sentenced to death by lethal injection.

DISCUSSION

ASSIGNMENT OF ERROR NO. 1: The Exclusion of Mitigation Evidence in the Penalty Phase; and

ASSIGNMENT OF ERROR NO. 12: The Exclusion of Evidence in the Guilt Phase
Under his first assignment of error, the defendant makes several arguments arising from trial court's limiting of his right to present some mitigating evidence in the penalty phase. In his twelfth assignment of error, he alleges that one of itemsa videotaped interviewwas also erroneously excluded from the trial of his guilt. (Assignment of Error No. 12 is treated at Part "G" under these assignments of error.)

A. The "Guilty Plea" Letter

Langley first argues that in the penalty phase the trial court erred by prohibiting him from presenting evidence of his supposed desire to plead guilty unconditionally, communicated in a letter from defense counsel to the District Attorney's office. In the letter, defense counsel states that, "Mr. Langley is prepared to accept any offer of settlement short of the death penalty that you see fit to make." Yet in the next paragraph, he states that "Mr. Langley is himself offering a plea of guilty to first degree murder regardless of your agreement. However, as you know, I do not believe that the trial judge is currently permitted to go along with the offer of a plea without your consent." Defense counsel acknowledged that the law prohibited Langley from an unconditional plea of guilty to capital murder, but the defense argued that the pre-trial offer should come before the jury at the sentencing stage as a demonstration of remorse.

B. An Alleged Flaw in the Capital Sentencing Scheme

At the time of the defendant's trial, La.C.Cr.P. art. 557 prohibited a defendant in a capital case from entering an unqualified plea of guilty in the absence of a plea agreement from the district attorney that the State would not seek the death penalty.[4] The defense asserts that this "flaw" in the capital sentencing scheme denied Langley the right to plead guilty and the right to present evidence of remorse to the jury.
This Court has held that there was "no prejudice in the statutory scheme which requires that a plea of not guilty be entered in a capital case." State v. Watson, 423 So.2d 1130, 1134 (La.1982). In Watson, the defense argued that the trial court erred by not allowing him to plead guilty in the first phase of trial because the overwhelming evidence of guilt prejudiced the jury. In holding that Watson did not suffer prejudice the Court noted that:
In the guilt phase, he did not present any evidence to the jury which challenged the prosecution's evidence of guilt. In opening argument of the penalty phase, he could have pointed out the foregoing fact to the jury and argued that the only issue from the outset was life or death, pointing out that he was required by law to plead not guilty in the first phase in order to contest the issue in the penalty phase. Id.

C. The Letter as Dubious Evidence of Remorse

In this case, the trial judge determined that the letter offered only a guilty plea in return for a life sentence and was not an offer of an open-ended plea after which a jury would decide the penalty. In ruling that the defense could not introduce the letter, the trial court essentially ruled that any marginally probative value in defense counsel's letter was far outweighed by the risk of *659 jury confusion and diversion in determining whether the letter reflected a genuine expression of remorse. La.C.E. art. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.").
The trial court and defense counsel could not agree on what the letter proposed, and jurors were in no better position to decide. The equivocal tone of the letter rendered it minimally probative of remorse. Moreover, if the offer did represent an invitation to bypass the guilt stage and proceed directly to the penalty phase, the letter's probative value was substantially undercut by the defense of insanity, offered to negate responsibility. The insanity defense may not absolutely preclude remorse, but neither is it consistent with remorse. The insanity plea in this case, when considered alongside the, at best, equivocal letter, indicates that the letter was mere trial strategy, more an indication of a desire to be spared than an expression of remorse. In sum, the trial court did not err or abuse its discretion in excluding the letter.

D. The Letter as Hearsay

The defense's attempt to offer the letter raised the recurring issue of hearsay. The defense claims that the letter was not an attempt at "judicial suicide" but rather was an expression of "everlasting remorse." In the end, however, only the defendant himself could explain what the letter meant. But defense counsel chose hereas it did throughout the caseto try to place selfserving statements in Langley's mouth without calling him to the stand. A sentencing hearing is to be "conducted according to the rules of evidence." La.C.Cr.P. art 905.2. The plea offer letteran out of court statement intended to prove the truth of the matter assertedwas hearsay. La.C.E. art. 801. No recognized exception to the hearsay rule applied, nor were there any indicia of the statement's reliability. The letter was properly excluded. Moreover, although Langley was not allowed to use the letter to argue his supposed desire to plead guilty unconditionally, he was not prohibited from putting on other mitigating evidence showing his acceptance of responsibility. Accordingly, he has failed to show that he suffered any prejudice from the trial court's ruling. The argument lacks merit.

E. The State's Closing Argument of "No Remorse"

The defendant argues that the State's penalty phase closing argument references to his lack of remorse compounded the trial court's erroneous rulings against admitting the letter. We have already held that the equivocal letter from defense counsel to the District Attorney was properly excluded. In any event, prosecutors are allowed broad latitude in choosing closing argument tactics. See, e.g., State v. Martin, 539 So.2d 1235, 1240 (La.1989). Although under La.C.Cr.P. art. 774 closing argument must be "confined to the record evidence and the inferences which can reasonably be drawn therefrom," both sides may still draw their own conclusions from the evidence and convey such view to the jury. State v. Moore, 432 So.2d 209, 221 (La.1983), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983). "Before allegedly prejudicial argument requires reversal, the court must be thoroughly convinced that the jury was influenced by the remarks and that such contributed to the verdict." State v. Taylor, 93-2201, p. 21 (La.2/28/96), 669 So.2d 364, 375; State v. Jarman, 445 So.2d 1184, 1188 (La.1984). We also ask whether the remarks injected "passion, prejudice or any arbitrary factor" into the jury's recommendation. Moore, 432 So.2d at 220.
Read in their entirety, the prosecutor's remarks simply gave her interpretation of the evidence and of the character of defendant's act, i.e., that killing a young child by manual strangulation, and then garrotting and hiding the body in a closet for three days while a search for the child was underway, may be fairly characterized as remorseless. To this extent, the argument did not exceed proper bounds or constitute reversible error. Accordingly, deferring to the "good sensibility and fairmindedness" of the jury, we are not convinced that the remarks improperly *660 influenced the jury. See Taylor, 669 So.2d at 375.

F. An Alleged Comment on Defendant's Failure to Testify

The defendant argues that the State referred to his failure to testify when it commented on his lack of remorse. This argument also fails. If the prosecutor makes a direct reference to the defendant's failure to testify, a mistrial should be declared, regardless of the prosecutor's intent. State v. Johnson, 541 So.2d 818, 822 (La.1989). But when the prosecutor's reference is not direct, the reviewing court inquires into the remark's "intended effect on the jury" to distinguish between impermissible indirect references to the defendant's failure to testify and permissible general statements that the prosecution's case is unrebutted. Id. See also State v. Smith, 433 So.2d 688, 696-97 (La.1983) (prosecutor's comments actually related to lack of evidence). The State commented on Langley's state of mind, not even indirectly on his failure to testify. Accordingly, this argument lacks merit.

G. The Videotape Excerpts of Defendant's Interview With Dr. Paul Ware

The defendant also contends that the trial court erred by not allowing him to present excerpts of a videotape of his interview with Dr. Ware, a specialist in forensic psychiatry and neurology. The defendant raised this issue regarding the guilt phase in Assignment of Error No. 12. We treat both assignments together.
Dr. Ware taped his interview with Langley in the spring of 1994. Although that session lasted five hours, the tape defense counsel proposed to introduce shows only 20-minutes of the interview. The parties first debated the admissibility of the tape during the guilt phase after Dr. Ware testified. In his testimony, and without objection from the State, Dr. Ware recounted defendant's statements to him attributing the victim's death to his attempt to exorcize the hallucinatory presence of Oscar Lee, the dead brother he never knew.[5] The defendant made no attempt to introduce the tape during Ware's testimony.
In its rebuttal case, the State called Dr. Arretta Rathmell to recount for jurors an entirely different confession made to her by the defendant in 1992shortly after the offense and two years before Dr. Ware conducted his interview. According to Dr. Rathmell, who agreed that defendant suffered from a schizotypal personality disorder, "the information that I got from Mr. Langley himself was that he knew he had killed Jeremy and he told me he knew it was wrong.... I distinctly remember it because I think it takes a good bit of fortitude to be able to say that, but he did say that, he did not hide it, he did not color that in any way; he said that's what he had done."
When asked by the prosecutor to explain the obvious differences in the statements given by the defendant two years apart, Dr. Rathmell attributed defendant's 1994 statement to his desire to please adult figures to make up for a lack of parenting when he was a child and to his luck in finding a "very caring attorney, and a very diligent one." The defense moved for a mistrial on grounds that Dr. Rathmell had implied that defense attorneys had manipulated Langley's responses to suit trial strategy. When the court denied that motion, counsel proposed *661 that the jurors listen to the 20-minute excerpt from Dr. Ware's interview with the defendant to determine for themselves the credibility of the defendant's statements and "whether Ricky Langley is telling the truth as he believes it on April 1st, 1994 or ... whether he just doesn't know what the truth is ... and we're in a position here where they can actually see something for themselves and figure out for themselves what's going on."
After extensive argument, the court excluded the tape. "I don't know of any situation," the judge observed, "where the defendant can give a self-serving statement out of court and the jury sees it and reads it ... That would be the same thing as having him writing it all down and handing it to them to read." The court made the same ruling at the start of the penalty phase.

H. The Tape as Hearsay

Counsel argues that he offered the tape not for its hearsay content but simply as evidence of the defendant's state of mind. In fact, however, counsel's arguments at trial indicate that the tape was offered for precisely a hearsay purposeto prove to the jury the truth of Langley's assertion that he killed in a state of delusion. The defendant's statements to Dr. Ware would have been admissible only for their non-hearsay value in revealing the basis of the doctor's opinion. See La.C.E. arts. 703 & 705(B). However, the statements themselves were already in evidence as part of Dr. Ware's testimony.

1. The "State of Mind" Exception

Counsel's argument that the tape is "state of mind" evidence also fails. The express language of La.C.E. art. 803(3) excepts from the definition of hearsay only "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition ... offered to prove the declarant's then existing condition or his future action." (Emphasis added). Counsel did not offer the tape to prove the defendant's state of mind in the spring of 1994 when he made the statement to Dr. Warea matter never at issue. Rather, defendant offered the 1994 tape to try to show his state of mind two years earliera matter very much at issue. "[A] state of mind evidenced by a speaker's remarks cannot be used to prove the speaker's past conduct." State v. Martin, 458 So.2d 454, 461 (La.1984) (citing Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933)). While there is some authority that evidence of a particular state of mind may look backward in time to prove the continuity of that state of mind, "it is reasonable to require as a condition of invoking the continuity notion that the declaration mirror a state of mind which, in light of all the circumstances including proximity in time, has some probability of being the same condition existing at the material time. Where there is room for doubt, the matter should be left to the discretion of the trial judge." McCormick, Evidence, § 295, p. 696 (Cleary, ed., 1972).
The tape was offered to prove the defendant's state of mind two years before he made the statement. There was substantial room for doubt as to whether the defendant's state of mind was the same when the tape was made as it was at the time of the crime. The taped statement did not come within the hearsay exception provided by art. 803(3) or any other exception to the hearsay rule. Under these circumstances, the trial judge correctly excluded the tape.

2. The Alleged "Mitigation" Exception Under the Eighth Amendment

The defense also argues that Louisiana's hearsay rules must give way to the overriding Eighth Amendment requirement that juries have the opportunity to consider and act upon all mitigating evidence offered by the defendant. He cites Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). The Supreme Court's per curiam opinion in Green v. Georgia, is so easily distinguished from this case that it hurts Langley's cause. In Green, a capital case, the trial court excluded as hearsay a statement made by the defendant's co-perpetrator who had previously been tried and sentenced to death on the basis of the statement. The co-perpetrator, Moore, had confessed to a close friend that he had sent the defendant off to run an errand before he shot and killed *662 the victim. Moore's statement that he alone killed the victim out of the defendant's presence was highly relevant to the issue of punishment at the defendant's trial, and it was only under "these unique circumstances," that the Supreme Court overturned the defendant's conviction and death sentence. Id., 442 U.S. at 97, 99 S.Ct. at 2151. The Green Court emphasized that "substantial reasons existed to assume [the statement's] reliability": The statement had been made spontaneously to a close friend; it was amply corroborated by the other evidence at trial; it was clearly against the co-perpetrator's interest and made for no apparent ulterior motive; and "[p]erhaps most important, the state considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it." Id. (footnote omitted). By contrast, Langley's statements are essentially exculpatory, and were made long after his crime to a witness the defense planned to call at trial. In short, they possessed no indicia of reliability that would justify admitting them. This argument fails.

3. The "Basis of Expert Opinion" Exception

Finally, the defense argues that the tape was admissible as evidence upon which Dr. Rathmell relied in forming her opinion. See La. C.E. art. 705, subd. B. Defense Counsel had sent a copy of the tape to Dr. Rathmell, but she testified that it "really didn't help" her form her opinion. Moreover, the tape was not made until two years after Dr. Rathmell saw the defendant and rendered her opinion. The tape simply was not evidence upon which Dr. Rathmell relied in forming her opinion. Accordingly, it was not admissible under La. C.E. art. 705, subd. B and the trial court properly excluded it from both the guilt and sentencing phases.

4. The Preference for Live Testimony

The trial court's ruling on the admissibility of the tape at both the guilt and sentencing stages goes to the heart of the overriding preference for live testimony in a face-to-face confrontation before the fact finder.[6] The Confrontation Clause and the intertwined rules governing the use of hearsay evidence have "as a basic purpose the promotion of the `integrity of the fact-finding process.'" White v. Illinois, 502 U.S. 346, 356-57, 112 S.Ct. 736, 743, 116 L.Ed.2d 848 (1992) (Rehnquist, C.J.) (quoting Coy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 2802, 101 L.Ed.2d 857 (1988)). Thus, neither the state nor the defendant may conduct a trial on the basis of prepared affidavits or other litigation statements which otherwise do not fall within a well-settled exception to the hearsay rule. See State v. Rault, 445 So.2d 1203, 1208 (La.), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984); State v. Martin, 356 So.2d 1370, 1373-74 (La.1978).

I The Limit on Social Worker Jill Miller's Testimony

Also under his first assignment of error, the defendant contends that the trial court improperly limited evidence of the impact of Ricky Langley's childhood offered through Jill Miller, a forensic social worker. The State objected to Ms. Miller's testimony because it would include the hearsay responses of everyone she interviewed. The trial court ruled that, on direct examination, Ms. Miller could give her conclusions, but she could not testify on direct examination to any hearsay statements from people she interviewed and upon whose statements she relied in forming her opinions. As the trial judge explained, Ms. Miller could testify, but she *663 could not "come up here on direct and start reciting stories and things she's been told."
Article 705(B) of the Louisiana Code of Evidence provides that, in a criminal case, every expert witness must state the basis for her conclusion. However, if the evidence is otherwise inadmissible, it can only be brought out on cross-examination. Miller's objectionable testimony was merely a retelling of facts obtained through the defendant's family concerning the family history; thus, it was hearsay. Under the plain language of art. 705(B), the trial court correctly ruled that it was inadmissible on direct examination.

J. The Limit of Dr. Clark Heindel's Testimony

Also under this assignment of error, the defendant argues that the trial court wrongly limited the testimony of Dr. Heindel and thereby prevented the defendant from proving that he never had a chance of avoiding pedophilia. The defense called Dr. Heindel, the mental health director with the Georgia Department of Corrections when the defendant was incarcerated there. Dr. Heindel holds a doctorate in educational psychology and counseling. He met with the defendant on at least ten occasions during the defendant's incarceration. During his testimony, the defense asked Dr. Heindel what he thought of the defendant's prognosis for treatment. He responded, "Pretty poor.... Well, at that point, I had not had that much experience working with pedophiles. But, I knew that it would take a significant amount of treatment with some very good aftercare." He went on to explain that in the last four or five years he had more experience with working with pedophiles. The defense further asked, "overall, in terms of when you say pretty poor, what sort of treatment do you feel, from your experience in this area, would cure Mr. Langley's problems?" The State objected to the question and the trial judge sustained the objection because, having not seen the defendant since his incarceration in Georgia, the witness was not qualified to give this opinion.
The purpose of an expert witness is to provide the jurors with a basis of knowledge and background information on a subject. La. C.E. art. 702. The trial judge is vested with broad discretion in ruling on the scope of expert testimony. La. C.E. art. 702, comment (d); State v. Billiot, 94-2419 (La.App. 1st Cir. 4/4/96); 672 So.2d 361, 373; State v. Mays, 612 So.2d 1040, 1044 (La.App. 2nd Cir.1993), writ denied, 619 So.2d 576 (La. 1993).
The witness admitted that at the time he was working with and evaluating the defendant he had very little experience with pedophiles. Thus, the trial judge did not abuse is broad discretion in determining that the witness was not qualified to offer his opinion of whether or not the defendant was curable. Therefore, this is not reversible error. We note also that the trial judge excluded testimony on this subject by the State's witness, Troy Mire, who had never treated Langley.

K. The Exclusion of Evidence of the Execution Process

In his next argument, the defendant contends that the trial court erred by not allowing him to present the jury with evidence about the execution process so that they would understand what it meant to impose the death penalty. Article 905.2 of the Code of Criminal Procedure states: "The sentencing hearing shall focus on the circumstances of the offense [and] the character and propensities of the offender...." In-depth evidence regarding the nature of the death penalty does not speak to the circumstances of the offense or the character of the defendant. See La.C.Cr.P. art. 905.2. Accordingly, it "makes no useful contribution to the process and serves to distract the jury's attention from the task at hand." People v. Morris, 53 Cal.3d 152, 218, 279 Cal.Rptr. 720, 759, 807 P.2d 949, 988 (Cal.1991) (trial court did not err by refusing defense request to explain to jury the explanation of the method of execution). See also People v. Pride, 3 Cal.4th 195, 10 Cal.Rptr.2d 636, 676, 833 P.2d 643, 683 (1992) ("Our cases make clear that information about administration of the death penalty does not aid the jury in making an *664 individualized determination of the appropriate penalty in a particular case.").
A jury in a capital case "must recognize the gravity of its task and proceed with the appropriate awareness of its `truly awesome responsibility.'" Caldwell v. Mississippi, 472 U.S. 320, 340, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985). However, the court's instruction that it was the jury's responsibility to determine whether the defendant should be sentenced to death or life imprisonment accurately and adequately informed the jurors of the importance of their decision, and nothing in the record suggests that the jurors were not well aware of the gravity of their responsibility. Accordingly, the defendant's argument that the trial court erred by prohibiting him from presenting other extraneous evidence lacks merit.

ASSIGNMENT OF ERROR NO. 2: The Use of "Prior Bad Acts" in the Penalty Phase
In his second assignment of error the defendant argues that the trial court erred by allowing the State to present evidence of prior alleged bad acts at the penalty phase without proper notice. The complained of evidence came from Langley's records from the Georgia prison system where he had been incarcerated for child molestation. The evidence consisted of parts of reports compiled by Dr. Clark Heindel, a defense expert who was Mental Health Director at the Youthful Offender Unit in Hardwick, Georgia. The reports dealt with Langley's entries in what the defense called Langley's "dream diary" which he kept while incarcerated.

A. The Prosecution's Comments About Defendant's Diary

In his first argument under this assignment, the defendant contends that the prosecution was improperly allowed to admit prior bad acts taken from the diary. The acts in question are instances of child molestation and terrorization described in the diary. The defense referred to the events as dreams or fantasies, while the prosecution argued that the diary entries recounted actual events. Notably, neither the diary entries nor the prosecution referred to any prior murders by Langley.
During the guilt phase, the defense introduced the diary evidence when the following excerpt from the May 11, 1988 report was read into evidence by Dr. Rathmell, on the defendant's direct examination:
Today he [Langley] showed me his diary which included several pages describing his sexual abuse of children, in which he would lure them into the woods and being to [sic] perform some sexual acts with them. When they begged to go home, he would take them further into the woods telling them this was the way home. During these episodes, he wrote that he was resolved to murdering the children after the acts, but apparently, at least in the cases of which he wrote, this did not occur.
Later, in the opening statement in the penalty phase, the assistant district attorney stated:
Remember the Georgia Department of Correctionsand this is part of his character and propensitythe Georgia Department of Corrections records which talked about his diary and how he wrote. This wasn't a fantasy. He wrote of instances in the past where he had taken children
The defense objected, arguing that this was not evidence and never would be. The trial judge overruled the objection on the grounds that, in the opening penalty argument the prosecution was permitted to say what it expected to prove during the penalty phase. The Assistant District Attorney then continued to read the passage and to assert that it represented actual acts of abuse.
The scope of the State's opening statement is prescribed in La.C.Cr.P. art. 766, which provides that it "shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge." In telling the jury that the defense had written in his diary about actual events, the prosecutor was explaining her interpretation of the diary and stating what she hoped to prove in the penalty phase; she was challenging the defense's characterization of the diary as simply dream or fantasy. "The scope of the opening statement *665 is left to the sound discretion of the trial judge." State v. Kinchen, 342 So.2d 174, 176 (La.1977). The trial judge did not abuse his discretion, but properly allowed the prosecutor's statement.
Even if the comments had exceeded the scope of acceptable argument, this Court will not reverse unless it is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. See, e.g., State v. Taylor, 93-2201, p. 21 (La.2/28/96), 669 So.2d 364, 375. Through Dr. Heindel's testimony, the defense was able to challenge the State's characterization. Moreover, through the defense's examination of Dr. Rathmell in the guilt phase, the jury already knew of Langley's damaging and "troubling" statement that he "had the urge to kill the children." In addition, the jury had already heard Dr. Ware testify at the guilt phase that Langley had discussed molesting a seven-year-old boy and threatening him with a gun. Deferring to the "good sensibility and fairmindedness" of the jury, we are not convinced that the disputed particular remarks improperly influenced the jury. Id. This argument lacks merit.

B. The Diary as "Other Crimes" Evidence

The defense also argues that the prosecution's opening at the penalty phase constitutes reversible error because the comments refer to other crimes, and there was no evidence that the diary was about actual events rather than just dreams or fantasies. At oral argument before this court, defense counsel conceded that the only real objection to the prosecution's comments was that he believed they were not true. However, the record shows that there was at least an arguable evidentiary basis for the comments.
Prior to the assistant district attorney's penalty phase opening, there had been no testimony as to whether the diary passages recounted actual events or only Langley's fantasies; defense counsel simply referred to the diary as "dreams" or "fantasies". During the penalty phase, Dr. Heindel stated, "I think he was writing down his dreams. I think Ms. Harden, [a Georgia prison official] who saw him first, instructed him or asked him to keep a diary." Dr. Heindel also said that he asked the defendant to write down his dreams. In referring directly to the defendant taking children into the woods, Dr. Heindel said:
And, there wasI think the one that disturbed me the mostand I'm really not sure how much of it was dream and how much was fantasy. But, I think it's described about taking a child or children into the woods. And, it was so vivid to me that I think it scared me. It was very unusual.
On cross-examination Dr. Heindel stated that he was not certain that the entries referred only to dreams or fantasies, but he believed they did. Dr. Heindel's testimony that the "vivid" and "unusual" diary entries scared him suggests that they may have represented more than just a dream or fantasy. In addition, Dr. Heindel conceded that "fantasies and dreams usually groom the behavior," and that it was "a possibility" that Langley had acted out his fantasies.
In closing, the defense argued that the jury should use commonsense with regard to the argument that the diary referred to something other than dreams or fantasies. Then, on rebuttal, the prosecution again asserted the actuality of the events described in the diary:
Let me quote fromthis is Georgia Department of Corrections record from January 12, 1987: "We dealt with some of his feelings. And I made the recommendation that he start keeping a diary and dealing with his feelings. And in dealing with some of the things that have happened in the past, and what his feelings was surrounding them." Fantasies and dreams, I don't think so. Things that happened in the past. You know that this man was a terrorizer of children.
The quoted passage indicates that Langley was asked to write not only about fantasies, but about "things that have happened in the past." We also note that Dr. Ware's earlier testimony about Langley's account of a prior molestation suggests an arguable possibility that Langley's diary recounted actual events. Thus, there was at least some evidentiary *666 basis for the State's argument that Langley could have recounted actual events in his diary, and the prosecution was allowed this "fair comment" on that evidence.
Further, the State had the right to challenge defendant's characterization of the diary contents as only dreams and fantasies. See State v. Jackson, 608 So.2d 949, 957 (La.1992) (trial judge to determine relevance of rebuttal evidence); State v. Davis, 411 So.2d 434 (La.1982). The defense introduced the diary to show dreams or fantasies that purportedly demonstrated a mental defect as a mitigating factor. However, the defense had no right to expect that its view of the diary as mere fantasy would be unopposed. The prosecution was not required to tacitly concede that the entries represented only imagined events.

C. An Alleged Fifth Amendment Violation

Defendant claims that, if the diary entries were "confessions" of actual events (which he denies), then their admission violated his Fifth Amendment right against selfincrimination, because he "was never warned of this right, and it was never waived." First, the privilege did not attach when the entries were made in Georgia prison, because Langley had no "reasonable cause to apprehend danger" from making the entries. See State v. Brown, 514 So.2d 99, 109 (La.1987) (quoting State v. Edwards, 419 So.2d 881 (La.1982)). Thus, the diary entries were not statements taken in violation of the Fifth Amendment. We also reemphasize that it was the defense that introduced the diary evidence and asserted that it was "fantasy." The defense may have thought or hoped that the statements were not somehow incriminating, but it had no reasonable basis to believe that its view would be uncontested. The State was not required to "Mirandize" the defense against the possible adverse effects of the its own strategy. This assignment lacks merit.

D. An Alleged Notice Requirement

The defense also argues that if the diary did recount actual events, then the prosecution committed reversible error by failing to give "other crimes" notice to the defense and prove that the events occurred by clear and convincing evidence. Evidence of unadjudicated crimes is admissible during the penalty phase after the trial court determines that (1) the evidence of the defendant's connection is clear and convincing; (2) the evidence is otherwise competent and reliable; and (3) the unrelated crimes have relevance and substantial probative value as to defendant's characters and propensities which is the focus of the sentencing hearing under La.C.Cr.P. art. 905.2. See State v. Brooks, 541 So.2d 801, 814 (La.1989). The State must furnish notice of it intention to use other crimes evidence within a reasonable time before trial. State v. Prieur, 277 So.2d 126, 130 (La.1973). In the penalty phase of a first degree murder trial, the character of the defendant is automatically at issue. State v. Bourque, 622 So.2d 198, 245 (La. 1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97); 699 So.2d 16. See also State v. Jackson, 608 So.2d 949, 953 (La.1992); La.C.Cr.P. art. 905.2. Evidence of unadjudicated other crimes is relevant to the defendant's character and propensities. Jackson, 608 So.2d at 954-956; State v. Brooks, 541 So.2d 801, 813 (La.1989). The jury may also consider the evidence from the guilt phase. La.Code Cr. P. art. 905.2.
Once again it is significant that the State did not enter the disputed evidence. Rather, the State merely referred to evidence raised by the defense in the guilt phase and expected to be raised during the penalty phase. When the defense raised the evidence on direct examination in the penalty phase, the prosecution cross-examined the defense witness about the diary. Under these circumstances, it would be unreasonable to require the state to give notice under Prieur.
Moreover, the prosecution did not need to prove by clear and convincing evidence that the events occurred in order to rebut the defense's view of the diary evidence. This precise issue has not previously been addressed by his court, but State v. Davis, 411 So.2d 434 (La.1982), is instructive. In Davis, the defendant testified, on direct examination by his own attorney, about two prior drug possession arrests. Id. at 438-39. The testimony *667 was intended to show constant police harassment of the defendant, and similar police misconduct. The prosecution cross-examined the defendant about the prior arrests in order to rebut his claims of harassment. This court held that the State had the right to rebut defendant's testimony by questioning him about the unrelated prior arrests.[7]Id. Here, the defendant tried to show that he had dreams and fantasies about abusing and terrorizing children. The prosecution responded to the defense's assertions by trying to show that the purported dreams and fantasies represented actual events.
In any event, not every Prieur violation is reversible error. A defendant must show a "substantial risk of grave prejudice" arising out of inadmissible or surprise admission of other crimes evidence. Prieur, 277 So.2d at 128; State v. Hooks, 421 So.2d 880 (La.1982); State v. Strickland, 398 So.2d 1062 (La.1981). The purpose of limiting evidence of unadjudicated criminal activity is to prevent surprise, undue prejudice, and the injection of an arbitrary factor into the jury's deliberations. See State v. Comeaux, 93-2729, p. 6 (La.7/1/97); 699 So.2d 16, 20. There is no presumption of prejudice. Prieur, 277 So.2d at 128.
Here the defendant fails to prove surprise, undue prejudice, or the injection of an arbitrary factor. First, the defense introduced the diary evidence and had no reasonable expectation that its characterization of the evidence would go unchallenged. Thus it was not subjected to surprise. Nor was the defense prejudiced. It was able to respond to the prosecutions arguments, and to examine Dr. Heindel, the compiler of the Georgia prison report, in front of the jury, and to argue that the jury should use its common sense in evaluating the diary evidence. Also, the impact of the prosecutions assertions was lessened somewhat by the fact that the jury had already learned of prior molestations through testimony in the guilt phase. Moreover, even if mere fantasy, the diary entries are, in themselves, powerfully damaging evidence of Langley's character and propensity toward harming children. We note again that the prosecution did not go beyond what was in the diary to argue that Langley had killed before. Accordingly, the defense was not surprised or prejudiced by lack of notice of the State's intent to argue that the events described were actual occurrences, and no arbitrary factor was introduced into the penalty phase. See Comeaux, 699 So.2d at 20; Ward, 483 So.2d at 589.

ASSIGNMENT OF ERROR NO. 8: The Penalty Phase Instructions; An Alleged Presumption in Favor of Life Imprisonment
The defendant argues that the court committed error when it failed to instruct the jury that the presumption is that life without parole is the appropriate punishment. This argument is without basis in either Louisiana or federal law. There is no presumption such as the one which the defense argues. See State v. Mitchell, 94-2078 (La.5/21/96); 674 So.2d 250, (unpublished appendix at viii). No court has ever made the inferential leap from the presumption of innocence during the guilt phase to an analogous "life presumption" at the penalty phase. No "presumptions" are incorporated into the jury's sentencing considerations as part of the capital sentencing process. La.C.Cr.P. art. 905, et. seq. The sentencing scheme as set forth in these articles meets both state and federal constitutional requirements. See State v. Loyd, 489 So.2d 898, 900-901 (La.1986); State v. Watson, 449 So.2d 1321, 1325 (La. 1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). Thus, this argument is groundless.

ASSIGNMENT OF ERROR NO. 10: The Defendant Briefly Removed from the Courtroom During the Guilt Phase
*668 In this assignment of error, the defendant argues that it was reversible error to exclude him from parts of his own trial. During the prosecution's opening statement, the defendant interrupted by saying that the district attorney was lying, and then ran to try to leave the courtroom. The judge had the defendant removed from the courtroom and excused the jury. After a brief recess, the defendant was allowed back into the courtroom, and the trial continued. A few days later, while defense expert Dr. Ware was testifying, the defendant again disrupted the trial:
Dr. Ware: He said he'd had enough of Oscar Lee and he blew on him and was going to get rid of him once and for all and started choking him. Finally, when the body went limp he looked down and recognized that he killed Jeremy Guillory. He didn't know what to do and realized
The defendant: (making noises and beating on the table) I didn't mean to kill Jeremy.
As the defendant was removed from the courtroom he was saying: "I thought it was Oscar," and "[w]hy don't they just kill me and get it over with." After a ten-minute recess the trial judge ruled that because of two outbursts occurred despite defense attempts to keep Langley calm the trial would continue with the defendant and one of his attorneys in a room immediately behind the courtroom. The room had a loud speaker so that Langley and his attorney could hear the proceedings. The judge did not foreclose the defendant from returning for the remainder of the trial, and in fact, the defendant returned to the courtroom the next day.
The United States Supreme Court has addressed the question under what circumstances an obstreperous defendant forfeits his right to be present at his trial. "A defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060-61, 25 L.Ed.2d 353 (1970). A trial judge "must be given sufficient discretion" to deal with a disruptive defendant, and "[no] one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." Id. See also State v. Washington, 322 So.2d 185, 187 (La.1975) (trial judge entitled to take adequate measures against accused's disruptions).
The record does not indicate that the trial judge explicitly warned the defendant that he would be excluded from the courtroom if he disrupted the trial again. The transcript merely shows that the jury was removed and the court recessed after Langley's first demonstration. Also, Langley's behavior was not as outrageous as that shown in Allen (defendant threatened the judge and tore up and threw around papers), or in two leading Louisiana cases, State v. Riles, 355 So.2d 1312 (La.1978) (defendant argued with judge and scuffled with sheriffs) or State v. Lee, 395 So.2d 700 (La.1981) (defendant sang the Star Spangled Banner and quoted scripture aloud during proceedings). However, the defendant's conduct was disruptive enough to warrant the trial judge's carefully measured response. The defendant was removed from the courtroom only during the afternoon of July 7th, during Dr. Ware's testimony. He was accompanied by counsel and placed in a room where he could hear the proceedings. Provisions were made so that the defendant could ask his counsel to interrupt the proceedings at any time. Though the defendant was not physically present in the courtroom, he was allowed to participate in his trial to the maximum extent his own misconduct would allow. The next morning the defendant returned to the courtroom when he indicated that he would try to control himself, and he was present for the remainder of the trial. Under the appropriate abuse of discretion standard of review, the trial judge did not commit reversible error.

ASSIGNMENT OF ERROR NO. 13: The Defendant's Arrest and Confession
In assignment of error number 13 the defendant argues that the trial court erred by failing to suppress statements and evidence seized from him after an allegedly invalid arrest for violation of his Georgia *669 parole. He claims first that the arrest warrant for the Georgia parole violation was invalid. In addition, he claims that even if the warrant was valid, the arrest itself was invalid because it was merely a pretext to permit the officers to question him about the murder for which he was condemned. Both arguments fail.

A. The Validity of the Arrest Warrant

The Georgia parole violation warrant was validly issued in September of 1990, shortly after Langley left that state without permission. Defendant was arrested in Louisiana on the outstanding Georgia warrant in February 1992, about 14 months after the Georgia warrant was issued, and only a few days after the murder of Jeremy Guillory. The arresting officers told defendant that they were arresting him for the parole violation, but also that they wanted to question him about the missing child. They twice advised Langley of his Miranda rights, and he confessed almost immediately on simply being asked whether he killed the boy. After the officers again explained his rights, and after Langley again expressly waived them, he confessed in detail, and allowed police to videotape him as he confessed and led them to the boy's body. In all, Langley was advised of his rights no less than four times.
Langley argues that the parole violation warrant became invalid because Georgia waived its right to execute it. Parolees and probationers have due process rights concerning revocation of their paroles or probations. Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). However, these due process rights are less than those involved in an ordinary criminal prosecution. Id., 411 U.S. at 788-89, 93 S.Ct. at 1762-63; Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). An unreasonable delay in executing a parole violation warrant may violate a parolee's due process rights in some cases. See State v. Savoy, 429 So.2d 542 (La.App. 2d Cir.1983). However, this is not such a case.
Some courts have spoken in terms of "staleness" and "waiver" with regard to unreasonable delays in the execution of parole violation warrants. See, e.g., Greene v. Michigan Dept. of Corrections, 315 F.2d 546, 547-48 (6th Cir.1963); United States v. Hamilton, 708 F.2d 1412, 1414 (9th Cir.1983). However, the underlying rationale of waiver or staleness concepts is the deprivation of the parolee's or probationer's constitutional rights to due process. See People ex rel. Flores v. Dalsheim, 66 A.D.2d 381, 413 N.Y.S.2d 188, 192 (App.Div.1979); Barker v. State, 479 N.W.2d 275, 278-79 (Iowa 1991). To hold that a parole violation warrant becomes stale by the mere passage of time alone would be to reward an elusive parole violator for remaining unavailable. Flores, 413 N.Y.S.2d at 192 (delay of almost three years not a violation of due process); Barker, 479 N.W.2d 275 (four year delay not violation of due process); Shelton v. United States Bd. of Parole, 388 F.2d 567 (D.C.Cir. 1967). In addition, waiver alone is not the proper rationale for invalidating a warrant, because waiver implies both a knowing relinquishment of a right, and the authority of a parole officer to relinquish that right on behalf of the state. Flores, 413 N.Y.S.2d at 192. See also Saunders v. Michigan Dept. of Corrections, 406 F.Supp. 1364, 1366-67 (E.D.Mich.1976) (noting that mere inaction does not amount to waiver).
Under a due process analysis, the length of time between the issuance and execution of a parole violation warrant is but one factor in determining its continuing validity. Barker v. State, 479 N.W.2d 275, 279 (Iowa 1991). A delay in execution must be unreasonable before due process is affected. United States v. Fisher, 895 F.2d 208, 210 (5th Cir.1990); United States v. Hill, 719 F.2d 1402, 1405 (9th Cir.1983); State v. Newman, 527 So.2d 1036-39 (La.App. 2d Cir. 1988). Factors in assessing reasonableness include (1) the state's diligence in attempting to serve the warrant; (2) the reason for the delay in serving the warrant; (3) the conduct of the parolee in frustrating service; and (4) actual prejudice suffered by the parolee as a result of the delay. Fisher, 895 F.2d at 210; Barker, 479 N.W.2d at 278-79.
We also note that the aim of the entire parole concept is "to help individuals *670 reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed." Morrissey, 408 U.S. at 477-79, 92 S.Ct at 2598-98. In accordance with this aim, parole authorities have inherently broad discretion in the supervision of parolees. Id. Parole authorities are not in a race against the clock to execute parole violation warrants. United States v. Gernie, 228 F.Supp. 329, 338 (S.D.N.Y.1964). Nor must arrest and revocation be an automatic or reflexive reaction to every violation. Hamilton, 708 F.2d at 1415; United States v. Tyler, 605 F.2d 851, 853 (5th Cir.1979).
According to the record, including testimony adduced at two separate suppression hearings on this issue, in the time between the issuance of the warrant and its execution, Georgia authorities may have initiated a process which might eventually have led to transferring Langley's parole supervision to Louisiana authorities. Langley claims to have spoken with his Georgia parole officer, Ben Poole, who purportedly said they could "work something out." (However, the defendant did not subpoena Poole.) Also about this time, Elizabeth Clark, the Louisiana parole agent, was in communication with Georgia authorities through her office. At their request, she verified that Langley was residing at his parents' home in Louisiana. Though Clark had no official authority to supervise Langley, she attempted to maintain contact with him unofficially. However, in November of 1991, without any transfer having been accomplished, Langley stopped reporting to Clark. In December of 1991, he moved from his parents' house without informing Clark, who could not locate him. In fact, Langley was not finally located until after the murder, when Clark informed investigators of Langley's last known residence (his parents' house). The investigators matched Clark's description of Langley with the description given by the victim's mother and discovered he was living in the Lawrence house where the murder occurred.
Also in September of 1991, Langley asked Louisiana State Trooper Charles Jones to see if there was a Georgia warrant out for Langley. At a pre-trial hearing, Jones testified that he told Langley he would check for warrants, and that he advised Langley to get in touch with local parole authorities to see about getting his parole transferred to Louisiana. Jones also testified that the first time he checked the computer for a warrant he found none, but a few days later he checked again and did find the Georgia warrant. Jones further testified that when discovered the warrant, he went out to arrest Langley at Langley's work place, but could not find him there. Finally, Jones testified that when he did see Langley some time later, he assumed that Langley had probably reached an arrangement with the Georgia parole authorities, based on Jones's discussion with Langley when they first spoke in September, as well as Jones's belief that Langley and his employer were attempting to contact Georgia authorities.
The court of appeal accurately summarized the matter when denying relief on Langley's motion to suppress:
Louisiana was investigating the defendant and the transfer had not been officially completed. Until the transfer of the defendant's parole supervision had been completed, Georgia retained the authority to execute the warrant. During this period, the defendant once again absconded from supervision, never informing anyone about his new residence, and exhibited his inability to conform to conditions of parole. The defendant's actions had frustrated the attempts by both Georgia and Louisiana authorities either to transfer parole supervision or to execute the parole violation warrant.
State v. Langley, 94-00326 (La.App. 3d Cir. 1994); 635 So.2d 784, 785.
Under these circumstances, Langley's due process rights were not violated. First, law enforcement authorities were reasonably diligent in attempting to serve the warrant. Langley's whereabouts were simply not known or easily ascertainable from September 1990 to September 1991. Second, the Georgia authorities had a valid reason for delaying the execution of the warrant while attempting to transfer parole. Instead of having Langley arrested immediately in September of 1991, they exercised their discretion *671 in attempting to fulfill the aims of the parole concept. They did not "waive" their right to execute the warrant, nor did they relieve Langley of his parole obligations. Any attempt at a transfer of parole was necessarily conditioned on Langley's cooperation. Third, Langley's own conduct frustrated service of the warrant. After no more than three months, and before any transfer of supervision could occur, Langley stopped his unofficial reports to Clark, and moved from his residence. Efforts to locate him had to begin anew. Fourth and finally, Langley cannot claim he was prejudiced by the delay in his arrest, partly because he was responsible for the delay, and also because he had no reasonable basis to expect that any parole transfer would proceed without adverse consequences to him if he did not do his part. A delay in execution of a parole violation warrant may frustrate the violator's due process rights if the delay undermines his ability to contest the violation, or to proffer mitigating evidence. United States v. Tippens, 39 F.3d 88, 90 (5th Cir.1994). These elements of prejudice are not present in this case.
In addition, we note that the defendant claims that only Georgia waived its right to execute the warrant. The Louisiana arresting authorities confirmed the existence of a facially and objectively valid warrant and relied in good faith upon on it. Even if we decided that there were problems with the warrant, which we do not, we would not be inclined to apply the exclusionary rule against those acting in good faith on a facially valid warrant. See United States v. Leon, 468 U.S. 897, 918-19, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984). Cf. also United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (police may act on wanted bulletins issued by police departments possessing probable cause or reasonable suspicion to have the defendant seized).

B. The "Pretextual" Arrest

The officers who arrested Langley did so under the authority of a valid warrant. Thus, their subjective intent to examine defendant about the murder is not significant. "Subjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional." Scott v. United States, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). The relevant principle of Scott is that "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." United States v. Causey, 834 F.2d 1179, 1184 (5th Cir.1987) (citing Scott). Like Langley, the defendant in Causey sought to have his confession suppressed because he was arrested under a warrant for one crime, but questioned about another. Causey, 834 F.2d at 1180. The Fifth Circuit noted that the rule of suppression exists "to deter unlawful actions by police. Where nothing has been done that is objectively unlawful, the exclusionary rule has no application." Causey, 834 F.2d at 1185 (emphasis in original). Therefore, even though the police suspected that the defendant was involved in the disappearance of Jeremy Guillory, the arrest was nonetheless proper because they had an objective reason to arrest him for violation of his Georgia parole. See also Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (allowing pretextual warrantless arrests based on probable cause).
Finally on the suppression issue, when the defendant was arrested, the officers properly explained his Miranda rights to him. He indicated he understood his rights and confessed to killing Jeremy Guillory. He was subsequently advised of his rights no fewer than three more times, and he waived his rights each time. His confession was voluntary and untainted by any form of coercion or undue influence. There is, therefore, no basis for suppressing the confession or any other evidence seized pursuant to defendant's arrest.

ASSIGNMENT OF ERROR NO. 16: Some Prospective Jurors Excluded for Cause

A. The Exclusion of Dr. Perry Prestholdt

The defendant argues that the trial court wrongly allowed the State to exclude venireman Dr. Perry Prestholdt (a professor of psychology) for cause, and that the error mandates that the death sentence be *672 vacated. If the granting the State's challenge of Dr. Prestholdt were error, it would not be subject to harmless error review. Gray v. Mississippi, 481 U.S. 648, 667-68, 107 S.Ct. 2045, 2056-57, 95 L.Ed.2d 622 (1987) (not subject to harmless error review). It would invalidate the death sentence, but not the conviction. Witherspoon v. Illinois, 391 U.S. 510, 522, n. 21, 88 S.Ct. 1770, 1777, n. 21, 20 L.Ed.2d 776 (1968) (affects only penalty). See also State v. Smith, 340 So.2d 247, 250-51 (La.1976); State v. Hunter, 340 So.2d 226, 231-32 (La.1976). However, the trial judge did not abuse his discretion in dismissing Dr. Prestholdt or any other juror for cause.
The state has a "legitimate interest in obtaining jurors who [will] follow their instructions and obey their oaths." State v. Williams, 96-1023, p. 5 (La.1/21/98); 708 So.2d 703 (quoting Adams v. Texas, 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The state may require "that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." Id. Not all death penalty opponents are subject to removal for cause, however. "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve ... in a capital case so long as they state clearly that they are willing to set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986) (emphasis added).
In accordance with these statements of law, Louisiana has enacted La.C.Cr.P. art. 798(2), which allows the state to challenge for cause:
The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt....
In addition, a juror may be unqualified if he "is not impartial, whatever the cause [unless] he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence." La.C.Cr.P. art. 797(2).
To be properly excluded from the jury for cause, a prospective juror need not state unequivocally that he or she could not impose the death penalty. Wainwright v. Witt, 469 U.S. 412, 419, 105 S.Ct. 844, 849, 83 L.Ed.2d 841 (1985). There need be "no ritualist adherence to a requirement that a prospective juror make it `unmistakably clear... that [she] would automatically vote against the imposition of capital punishment....'" Id. (citations omitted, emphasis in original). The Witt Court continued:
What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"... there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... this is why deference must be paid to the trial judge who sees and hears the juror.
Id., 469 U.S. at 424-25, 105 S.Ct. at 852-53; Williams, 96-1023, pp. 8, 10; 708 So.2d at 710 (where trial judge noted potential juror's obvious "struggle" with voir dire questions regarding the death penalty). See also State v. Nicholson, 437 So.2d 849, 853 (La.1983) (where judge noted prospective juror's "body English"). Accordingly, the law only requires that the trial court's decision be "fairly supported" by the record reviewed "as a whole". Witt, 469 U.S. at 431, 105 S.Ct. at 856. See also Williams, 96-1023, p. 10; 708 So.2d at 710 (trial judge should not merely consider correct answers in isolation, but potential juror's answers as a whole).
*673 In support of his arguments that Dr. Prestholdt should have been seated, the defendant cites cases decided under the pre-1990 Code of Criminal Procedure article 798. See State v. Berry, 391 So.2d 406, 410 (La. 1980); State v. Copeland, 530 So.2d 526, 533 (La.1988). Prior to 1990, the article required that the prospective juror must have made it "unmistakably clear" that he or she would "automatically" impose a life sentence no matter what the evidence. The current article, in effect at the time of the murder and trial, reflects the United States Supreme Court's Witt jurisprudence and eliminates the "unmistakably clear" requirement. It is also no longer necessary to show that the prospective juror would "automatically" vote to impose life imprisonment. Now it need only be shown that the prospective juror's attitude would "prevent or substantially impair him from making an impartial decision." La.C.Cr.P. art. 798(2)(b).
On examination by the court, Dr. Prestholdt conceded that he was "very uncomfortable with the death penalty." When Mr. Bryant, the district attorney, asked Dr. Prestholdt whether his conscientious scruples would "prevent or substantially impair" him from making an impartial decision, Dr. Prestholdt indicated that he "would like to say" that he could be impartial, but "realistically, say, well, that's not true." It is apparent even from the transcript that Dr. Prestholdt conceded that his views on the death penalty would impair his partiality.
If the circumstances under which a prospective juror could vote for the death penalty are too narrowly limited, the prospective juror may be properly discharged for cause. This is similar to the issue we recently discussed in Williams, 96-1023; 708 So.2d 703. In our Williams opinion, we recognized that prospective jurors were properly excluded when their ability to decide on the death penalty would be substantially impaired by the presence of a mitigating factorin that case the defendant's youth. Williams, 96-1023, pp. 9-10; 708 So.2d at 713. A juror must be able to consider mitigating factors. But when the trial judge, within his or her discretion, determines that a prospective juror's attitude towards a mitigating factor constitutes a "substantial impairment" of the juror's ability to impartially decide the case, then the prospective juror may be excluded. Williams, 96-1023, p. 10; 708 So.2d at 713. See also State v. Jordan, 420 So.2d 420 (La.1982) (prospective juror properly excused where he would vote for death penalty only if he witnessed the crime); State v. Nicholson, 437 So.2d 849, 854 (La.1983) (prospective juror would only vote for death penalty in a mass murder on the scale of Adolf Hitler or Charles Manson); State v. Lindsey, 543 So.2d 886, 895-96 (La.1989) (prospective juror might vote for death "where a person murdered 35 elementary school children").
In voir dire Dr. Prestholdt said that in order for hin to vote for the death penalty there would have to be "no mitigating circumstances." He later modified this requirement to "little or none". The prosecutor then asked Dr. Prestholdt:
If there was anything, any mitigating factor brought up, then you would automatically vote against the death penalty?
Dr. Prestholdt:
Automatically is a little harsh. But yes. If you're asking me what my biases are. In relation to the death penalty my biases would be to vote against the death penalty.
On the whole, Dr. Prestholdt's "requirement" that there be no mitigating evidence appears enough to justify disqualification. The trial judge was in the best position to interpret Dr. Prestholdt's statements in the context in which they were given and he did not abuse his discretion in excluding Dr. Prestholdt.
More significantly, however, Dr. Prestholdt volunteered, without being asked, that his views on the death penalty would affect his consideration of the evidence during the guilt phase of the trial. A prospective juror may be removed for cause if the juror's "attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt...." La. C.Cr.P. art 798(2)(c); State v. Welch, 368 So.2d 965 (La.1979).
Dr. Prestholdt said:
I know that my opinions about the death penalty as consequences for crime will *674 somehow affect the judgments that are made, and my view of the evidence.
Mr. Bryant:
I understand. It would also affect your view of the evidence. Is that correct?
Dr. Prestholdt:
Realistically, I believe that's true.
Mr. Walker, defense counsel, tried to rehabilitate Dr. Prestholdt.
Mr. Walker:
And I think I understood you to say that you could be fair during  there's no question about your ability to be fair during the first stage of the trial where the death penalty is not an issue, the only issue is guilt or innocence?
Dr. Prestholdt:
No. I will try to be fair. Realistically and honestly, the fact that there is a death penalty as a consequence of a juror's decision in this case, it has to have some impact on the way I view evidence and the way I make decisions.
Dr. Prestholdt's admission that his attitude toward the death penalty would influence his view of the evidence of guilt or innocence is basis for his dismissal.
In sum, Dr. Prestholdt was, at best, equivocal as to whether he could follow the judge's instructions as to the burden of proof or the death penalty. Though he sometimes suggested that he would try to follow the judge's instructions and impartially consider either the evidence or the penalty, he consistently backed off of this position by reiterating his opposition to the death penalty. Dr. Prestholdt also voluntarily noted the effect his opposition would likely have on the determination of guilt or innocence.
The trial judge saw Dr. Prestholdt's facial expressions and body language, and he heard the tone and inflection of his voice. The trial judge also applied the proper standard under Witt and article 798 when he found that Dr. Prestholdt's attitude toward the death penalty "would prevent him or substantially impair him from making an impartial decision." Under these circumstances, the trial judge did not abuse his discretion in dismissing Dr. Prestholdt for cause.

B. The Exclusion of Mr. Wilbert Robertson

The defendant also argues that Mr. Wilbert Robertson was also improperly excused for cause when he could have sat with the requisite impartiality. Initially, when asked if he could consider imposing the death penalty Mr. Robertson stated, "I don't know." Although the defense attempted to rehabilitate him, when asked whether he could consider imposing a death sentence and consider imposing a life sentence, he again answered that he did not know. When questioned further he said, "I guess I have to know the evidence of what happened." The defense tried one last time by asking: "But you're not ruling out the possibility that, in fact, you could vote for the death sentence if you were convinced that the facts were really bad enough?" Mr. Robertson answered, "I guess. I don't know."
These responses do not indicate that Mr. Robertson could consider the death penalty. Despite being repeatedly asked if he could apply it he was never able to clearly state that he could consider it. Accordingly, the trial judge properly granted the State's challenge with regard to Mr. Robertson.

ASSIGNMENT OF ERROR NO. 21: An Alleged Impediment to Some Mothers' Jury Service
In this novel assignment of error the defendant argues that the refusal of the trial court to take steps to enable mothers of small children to sit as jurors deprived Langley of a fair trial. The Court may excuse petit jury members when family problems "would make service on a sequestered jury an undue hardship." State v. Sheppard, 350 So.2d 615, 650 (La.1977). Likewise, a trial judge may excuse a prospective juror in cases in which jury service would entail significant financial hardship and prevent him or her from concentrating fully on the case. State v. Sears, 298 So.2d 814, 820 (La.1974), overruled on other grounds by State v. Lovett, 345 So.2d 1139 (La.1977). Although the economic impediment to jury service caused by the lack of compensation or support services may be less than ideal, it is not the role of this Court to establish a system in which *675 lost wages and child care are provided to jurors who demonstrate economic hardship but nonetheless desire to serve. In any event, we fail to discern how the defendant may have been prejudiced by the exclusion of this vaguely defined group. Accordingly, this assignment lacks merit.

CONCLUSION
The defendant, Ricky Langley, raises no errors that would mandate reversal of his conviction or death sentence.

DECREE
The defendant's conviction and sentence of death are hereby affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La. R.S. 15:567, until (a) the defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denied his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.

ON APPLICATION FOR REHEARING
PER CURIAM.[**]
The recent decision in Campbell v. Louisiana, ___ U.S. ___, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), held that a white defendant has third party standing to assert the rights of African-Americans excluded from grand jury service on account of race. The Court also held that under Louisiana's grand jury selection process, whereby eleven grand jurors are selected by lot but the foreperson (who is the twelfth grand juror) is selected by the judge, a claim of discrimination in the selection of the grand jury foreperson must be treated as a claim of discrimination in the selection of the grand jury itself. Id. at ___, 118 S.Ct. at 1422.
We therefore grant rehearing in part and remand the case to the district court for an evidentiary rehearing on the defendant's allegation, properly raised before trial, that the foreperson of the Calcasieu Parish grand jury that indicted the defendant was selected in an intentionally discriminatory manner. The defendant may appeal to this court from any adverse ruling on this motion. In all other respects, the application for rehearing is denied.
NOTES
[*] Knoll, J., not on panel, recused. Rule IV, Part 2, § 3. Justice Knoll, who was originally assigned to this panel, recused herself after oral arguments upon discovering that she, while serving as a judge on the Third Circuit, had participated in the consideration of a writ in this case some years back. L.C.C.P. art. 151(B)(3). Justice Victory, who was not assigned to the original panel, was substituted in her stead and has, before voting, had the benefit of audio tapes of the oral arguments, the briefs of the parties, the record, and conference discussions.
[1] Arguments not address in this published opinion are addressed in an unpublished appendix to the opinion.
[2] At one point Langley confessed that he placed his penis in the victim's mouth, and ejaculated. However, Langley later denied this, and the autopsy and forensic examinations revealed no evidence of semen.
[3] According to Agent Dixon, the failure to locate a young child within 24 hours of the report that he is missing triggers a presumption of kidnaping and interstate flight; the FBI then becomes involved.
[4] As amended by Acts 1995, No. 434, § 1, La. C.Cr.P. art. 557 now provides:

A court shall not receive an unqualified plea of guilty in a capital case. However, with the consent of the court and the state, a defendant may plead guilty with the stipulation either that the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence without conducting a sentencing hearing, or that the court shall impanel a jury for the purpose of conducting a hearing to determine the issue of penalty in accordance with the applicable provisions of this Code.
[5] According to Dr. Ware, defendant told him that:

He had met Jeremy when he came to visit Joey and felt an attraction toward him and also protective of him ... During the next four or five days he continued to struggle with Oscar Lee who was telling him that he might as well give in and go ahead and have Jeremy. On February the 7th he was at his home alone when Jeremy came by asking to play with Joey. He told him Joey was not at home and that Jeremy could come inside if he wanted to. He said Jeremy came inside with his BB gun, and as he came inside and started up the stairs towards Joey's room, Ricky remembered battling with Oscar Lee and telling him that he was not going to hurt Jeremy and he was not going to allow him to hurt Jeremy. He said he'd had enough of Oscar Lee and he blew on him and was going to get rid of him once and for all and started choking him. Finally when the body went limp he looked down and recognized that he killed Jeremy Guillory.
R., pp. 7939-40. (It is unclear what role delusions of Oscar Lee were supposed to have played when Langley garroted the victim to be sure he was dead.)
[6] As embodied in the Confrontation Clause, the preference for live testimony subject to crossexamination evolved largely in reaction to abuses in 16th century English courts in which affidavits or other carefully prepared documents in anticipation of litigation were used at trial as evidence against the accused. See White v. Illinois, 502 U.S. 346, 363, 112 S.Ct. 736, 746, 116 L.Ed.2d 848 (1992) (Thomas, J., dissenting) ("`It is sufficient to note that the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on "evidence" which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact.'") (quoting California v. Green, 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970)).
[7] Similarly, in State v. Ward, 483 So.2d 578, 587-88 (La.1986), the defendant expected the prosecution to introduce evidence of other sexual crimes. Id. at 587. In its penalty phase opening, the defense attempted to explain this misconduct as crimes involving "psychological problems." Id. This court held that introduction of the prior bad acts did not create any unfair surprise nor inject any arbitrary element into the penalty phase. Id. at 587-88. Justice Lemmon concurred, but would have held that admission of the bills of information of the prior crimes was error, though harmless. Ward, 483 So.2d at 592 (Lemmon, J., concurring).
[**] Knoll, J., not on panel; recused.