813 So.2d 356 (2002)
STATE of Louisiana
v.
Ricky Joseph LANGLEY.
No. 95-KA-1489.
Supreme Court of Louisiana.
April 3, 2002.
*358 Clive Adrian Stafford Smith, R. Neal Walker, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Robert "Rick" Bryant, District Attorney, Frederick W. Frey, Vernon E. McGuire, III, Lake Charles, Carla S. Sigler, Mike K. Stratton, Paul P. Reggie, Lake Charles, Counsel for Respondent.
CALOGERO, Chief Justice.[*]
Compelled by respect for the United States Supreme Court's decision in Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), this court, after affirming Ricky Langley's conviction and sentence to death, granted in part his application for rehearing and remanded the case to the district court for an evidentiary hearing and a determination as to whether there had been intentional discrimination on the basis of race and/or gender in the selection of the foreperson for the grand jury that indicted Langley in 1992 in Calcasieu Parish. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, 675 (on rehearing). After conducting that hearing, the district court found that the defendant had established a prima facie case of intentional discrimination, which the State failed to rebut. For the reasons that follow, we affirm the district court's ruling granting the defendant's motion to quash the indictment.

FACTS AND PROCEDURAL HISTORY
In 1992, a Calcasieu Parish Grand Jury indicted the defendant for first degree *359 murder. Following a 1994 trial, a jury found the defendant guilty as charged, and unanimously sentenced him to death. On original hearing in State v. Langley, supra, this Court affirmed his conviction and sentence of death. In an unpublished appendix, we addressed the defendant's claim that the district court had improperly denied without a hearing his pretrial motion to quash the indictment on grounds of racial discrimination generally in the selection of grand jury forepersons in Calcasieu Parish and specifically in the selection of the grand jury that had indicted him. Our resolution of the issue relied in part on our prior decision in State v. Campbell, 95-0824 (La.10/2/95), 661 So.2d 1321, which held that a white defendant lacked standing to raise equal protection claims involving discrimination against African-Americans in the selection of grand juries. One week after this Court rendered its opinion in Langley, the United States Supreme Court reversed our decision in State v. Campbell, and held that a white defendant does have third-party standing to raise claims of racial discrimination in the selection of the grand jury that indicted him. Campbell v. Louisiana, 523 U.S. at 400, 118 S.Ct. at 1424. The defendant immediately moved for rehearing, and in June 1998, this Court granted the motion in part and remanded the case to the district court for an evidentiary hearing in light of that very recent United States Supreme Court opinion in Campbell v. Louisiana. Langley, 95-1489, 711 So.2d at 675.
During the summer of 2000, the district court conducted the evidentiary hearing as ordered. In March 2001, the district court issued a judgment finding that the state had failed to rebut a prima facie case of discrimination made by the defendant and that the indictment must be quashed, thereby upsetting the conviction and ordering further proceedings. The State now seeks review of the district court's ruling[1].
At the time of the defendant's indictment in 1992, Calcasieu Parish followed the system of grand jury foreperson selection prescribed in La. Code Crim. Proc. art. 413(B), before it was amended in 1999.[2] Prior to amendment, the article *360 called for the district court to select one person from the grand jury venire to serve as the foreperson of the grand jury. Then, pursuant to former Article 413(B), the sheriff would draw "indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury." La. Code Crim. Proc. art. 413(B) (West 1991). The foreperson votes as any other juror. Thus, when a judge in Louisiana chose a foreperson, he also selected one member of the grand jury panel outside of the random draw used to compose the balance of the panel. In the instant case, the foreperson from the grand jury that indicted the defendant was a white male.
After remand from this court, the district court held an evidentiary hearing conducted on June 29, 2000, July 20, 2000, and August 10, 2000. The relevant time period to be examined was identified as the twenty-two-year period commencing March 27, 1972, and running through June 23, 1994, the year in which the defendant was tried. During that period, 49 grand juries were impaneled, and each panel consisted of a foreperson selected by the judge and eleven members randomly selected by lot by the sheriff. The gender and race of the forepersons of those 49 grand juries were identified. And, although the race and gender of the non-foreperson jurors serving on 46 of those 49 grand juries were known, the composition of the first three grand juries was not.[3] Accordingly, the base number of grand jurors was 526 grand jurors randomly selected from the grand jury venires.[4] However, the race and gender of 3 of those 526 grand jurors were not initially established, although they were believed to be women based on their first names. Thus, subtracting those three from the total of 526 grand jurors left 523 actual grand jury members and alternates, i.e., those who were randomly selected from the grand jury venires summoned to serve as grand jurors pursuant to Article 413(B).
At the first hearing date, the defendant submitted the race and gender of each of the 523 randomly-selected grand jury members, who actually served as grand jurors or alternates, and the 49 judge-selected grand jury forepersons for the twenty-two-year period. The information was compiled by the defendant through a search of court minutes, voter registration lists, marriage and death certificates, and field interviews. The State stipulated (1) to the authenticity of the records introduced by the defendant and (2) to the fact that the statistical information had been compiled from those records.
Also at the first hearing date, the defendant called Dr. Joel Devine, an expert in the field of quantitative sociology, to explain the results.[5] Specifically, the witness *361 stated that he had been provided with the race and gender for 523 names out of the total of 526 grand jurors and alternates randomly selected to serve. Although the gender of the three missing persons was probably identifiable based on their first names,[6] Dr. Devine assumed otherwise, and calculated the data as if the three were white males. Furthermore, because women had been exempted from jury service prior to 1975, Dr. Devine adjusted the figures to omit three additional pre 1975 grand juries.[7] By doing so, the total number of identifiable, randomly-selected grand jurors, 523, was reduced by 33 to 490.[8]
Dr. Devine's testimony revealed that, of the 490 persons randomly selected as grand jurors from 1975 to 1994, 22.9% were African-American and 52.4% were female. These figures, according to Dr. Devine, were "highly representative" of the voter registration and census figures for Calcasieu Parish. For example, African-Americans constituted 20.3% of the registered voters from December 1988, and according to the 1990 census, African-Americans constituted 22.9% of the entire population in Calcasieu Parish. With respect to women, the census figures from 1970, 1980, and 1990, showed that women comprised between 51% and 51.2% of the population.
Dr. Devine found that these numbers did not correspond to the percentages of African-Americans and women selected since 1975 to serve as grand jury forepersons. Although African-Americans composed 22.9% of the grand jurors randomly selected since 1975, only three of the 43 grand jury forepersons selected by judges after 1975 were African-American, or 7%. With respect to women, who comprised 52.4% of the grand jurors randomly selected since 1975, just 12 of the 43 forepersons selected by judges after 1975 were women, or 27.9%.
Using a standard statistical formula,[9] Dr. Devine computed the probabilities of these small numbers occurring by chance, given the percentages of African-Americans and women in the group of grand jurors randomly selected to serve. According to the witness, the probability of randomly selecting just 3 African-American *362 grand jury forepersons out of 49 was 1 in 392, given that African-Americans made up 21.6% of the pool of grand jurors. For women, the probability of selecting only 12 women grand jury forepersons out of 43 was 1 in 1502, given that women comprised 52.4% of the pool of grand jurors randomly selected to serve between 1975 and 1994.[10]
After the defense rested, the state called the appointing judge who had selected Mr. Warren Hicks, a white male, as the foreperson for the grand jury that indicted the defendant. When asked if he had any special criteria for selecting Mr. Hicks as foreperson, the judge testified that he chose people with whom he was "personally acquainted, or somehow or other knew." The judge specifically stated that he picked Mr. Hicks because he and the judge were "casually acquainted" and because the judge thought Mr. Hicks was a "good, responsible, stable citizen." On cross-examination, the witness agreed that the majority of the people he knows would be white. After reviewing a list of 85 people who had been called for service on the grand jury that indicted the defendant, the appointing judge recognized the names of only eight people whom he knew or thought he knew, including one white woman, two men who were later identified as African-American, and five white men, one of whom was Mr. Hicks.
Another State witness was Mary Kaye Allemond, executive secretary for the district attorney's office, who stated that her duties included setting the grand jury docket. The witness acknowledged that two grand juries were available at the time of the defendant's indictment, one regular and one special. However, she stated that the docket is set randomly and further related that the first meeting of either of the two empaneled grand juries subsequent to the defendant's arrest was the special grand jury where the foreperson was Warren Hicks. The witness testified that her selection of the special grand jury on the date of the defendant's indictment was not based on the race or gender of the foreperson or the members of that particular grand jury. She explained that she had been instructed by the district attorney to set the defendant's case in front of a grand jury as soon as possible.
In response to the State's case, the defendant first called Sidney Rosteet, a former sheriff's deputy who had served as the appointing judge's law clerk when Mr. Hicks was chosen as the grand jury foreperson. According to Mr. Rosteet, the list of 85 venire members revealed a number of African-Americans and women who were of good moral character, including prominent local citizens involved in government or business. Next, the defendant submitted records showing that Mr. Hicks had been the subject of litigation, settled unfavorably to him, before his service as the foreperson in the instant case. Documents from the federal lawsuit revealed complaints that Mr. Hicks had failed to follow union rules and had restricted discussion by union members at meetings. Finally, the defendant filed a list substantiating the race and gender of the 85 people *363 called for grand jury service in the instant case.
The district court granted the defendant's motion to quash the indictment, after finding that the defendant had presented a prima facie case of discrimination and that the State had failed to rebut this prima facie case. The court set forth the law as follows:
A litigant establishes a prima facie case of discrimination by proving three things. First, the excluded citizens were part of a "cognizable group." Second, that the degree of under-representation was significant over a period of time. And finally, that the selection process was susceptible to abuse. See, e.g., Castaneda v. Partida, [430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) ]; Johnson v. Puckett, 929 F.2d 1067, 1071-72 (5th Cir.1991).
* * *
Once a litigant establishes a prima facie case of discrimination, the State then bears the burden to "show that the pattern of under-representation proved... was the result of a `racially-neutral selection procedure.'" Guice v. Fortenberry, 722 F.2d 276, 280 (5th Cir.1984) (Guice II) (quoting Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)).
* * *
The State must prove that the Court used "racially neutral" and "objective" criteria in selecting forepersons. Guice II, 722 F.2d at 280; see also Johnson v. Puckett, [929 F.2d at 1073]. The criteria should also directly relate to the foreperson's ability to perform the administrative functions and duties of a grand jury foreperson. See United States v. Perez-Hernandez, 672 F.2d 1380, 1387 (11th Cir.1982); United States v. Sneed, 729 F.2d 1333, 1337 (11th Cir.1984).
Slip op., pp. 10 and 14.
In its lengthy reasons, the district court acknowledged Louisiana's "unique" method for selecting a grand jury foreperson, as it operated prior to its amendment in 1999. The district court, citing the United States Supreme Court's reasoning in Campbell v. Louisiana, supra, noted that Louisiana's nowrepealed selection system implicated not only the appointment of the foreperson but, more intrinsically, the shaping of the composition of the panel itself and the possibility that there might be discrimination in doing so. The district court, again citing Campbell v. Louisiana, further noted that, by picking a member of the panel, not at random, "the judge has actually injected racial discrimination into the process."[11]
*364 The district court then turned to the evidence presented by the defendant and the State. The court rejected the State's contention that the defendant should have compared the percentage of black and female forepersons selected only to the percentage of blacks and females in the population eligible to sit on the grand jury, i.e., eliminating from the gross population figures those persons not eligible to serve as grand jurors under La.Code Crim. Proc. art. 408. The district court noted that the State had cited the dissenting opinion in Castaneda v. Partida, instead of the majority opinion, which required only that the degree of under-representation be determined by comparing the portion of the particular group in the "total population." Based on a comparison of the percentages of blacks and women in the total population with the small number of women and African-Americans selected as grand jury forepersons, the district court described the numbers as "paint[ing] a stark picture." The district court concluded that the defendant's evidence "proves that `it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process.'" Slip op. at 10, quoting United States ex rel. Barksdale v. Blackburn, 639 F.2d 1115, 1122 (5th Cir. 1981).
The district court next addressed whether it had been required to decide if the defendant had made out a prima facie case of discrimination upon the close of the defendant's case. The court found that the State had legally waived any challenge to the prima facie case. The court reasoned that, after the defense had rested its case, "there was no need for the Court to find a prima facie case of discrimination because the State chose to present evidence in `rebuttal.'" Slip op., pp. 10-11.
The court ultimately held that the State had failed to rebut the defendant's prima facie case of discrimination. The rebuttal's most fundamental flaw, according to the court, was that the State made no effort to refute the pattern of discrimination alleged and proven by the defense. Instead, the State relied solely on the testimony of the appointing judge concerning his selection of Mr. Hicks as grand jury foreperson for the defendant's case. The court found the State's reliance on the appointing judge's testimony per se insufficient, and noted that the judge's stated reason for choosing him based solely on their personal acquaintanceship was "patently insufficient to rebut the prima facie case of discrimination." The district court concluded that the State could not reasonably rely on one "bland denial by one of the many actors involved" to rebut a long history of discrimination. Slip op., p. 11. Relying on the United States Fifth Circuit's decision in Guice II, in which the State there also presented only the testimony of the judge who had selected the grand jury forepersons, the district court observed that the claimed use of objective criteria in the selection process does not rebut a defendant's prima facie case of *365 discrimination when the appointing judge selects from amongst only those venire members whom he knows. The district court reasoned that the instant case was not one in which the appointing judge used criteria that could reasonably be described as objective. Even if the appointing judge's criteria seemed objective on their face, the court reasoned, citing Guice II, "they are insufficient if they are only used to sort amongst those prospective forepersons the judge knows."[12] Slip op., p. 17.
Furthermore, the district court found that the appointing judge's assertions that he did not discriminate on the basis of race or gender were insufficient. Citing inter alia Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 540, 24 L.Ed.2d 567, 579 (1970), and Alexander v. Louisiana, 405 U.S. at 631-32, 92 S.Ct. 1221, the district court observed that protestations of good faith or even assertions that race or gender considerations played no role in the selection do not rebut a prima facie case of discrimination. The court also noted federal jurisprudence dictating that testimony from the alleged discriminators should be viewed with great scrutiny, citing Guice II.
The district court found that the evidence established that the exclusion of African-Americans and women as grand jury forepersons over the twenty-two-year period under scrutiny was the product of unlawful discrimination in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment, as well as a violation of Sections 2, 3, and 15 of Article I of the Louisiana Constitution of 1974. The court further found that the discrimination constituted special grounds for a motion to quash, as provided in La. Code Crim. Proc. Art. 533(1). After concluding that the State failed to rebut the defendant's prima facie case of race and gender discrimination, the district court quashed the indictment, effectively upsetting the defendant's conviction and ordering further proceedings.

DISCUSSION
We first consider the State's Supplemental Assignment of Error No. 1, in which it argues that the district court erred in finding that the State had legally waived any challenge to whether or not the defendant had made out a prima facie case of discrimination.[13] The district court reasoned that, because the State had decided to respond to the defendant's case, there was no need for the court to determine whether or not the defendant had established a prima facie case of discrimination at that time. Instead, the State argues, pointing to the supplemental transcript of the colloquy following the close of the defendant's case-in-chief, the district court itself had unilaterally decided, with the defendant's consent, to refrain from making a decision on whether a prima facie case was established until after the State had presented its evidence.
The district court's reasoning regarding waiver was arguably imprecise, if not wrong, given its own statement on the record to the effect that it preferred to wait until hearing the State's rebuttal evidence before deciding whether the defendant *366 had made out a prima facie case of discrimination. Notwithstanding, the end result of the district court's ruling is correct, because the State under the circumstances of this case is not entitled to have a new evidentiary hearing with a chance to put on more evidence to rebut the defendant's prima facie case, which is the relief the State seeks. According to the supplemental transcript, the State was certainly aware that the district court would render its decision as to whether a prima facie case had been proved only after the State presented its evidence. Although the State now argues that it did not present all of its evidence in reliance on the district court's failure to decide the prima facie case, this argument is belied by the transcript, which reveals that the State did not object to the district court's decision to withhold its ruling on the defendant's case until after the State had presented its evidence. Furthermore, the prosecutor, once the district court had indicated its intentions, merely requested a continuance and a future hearing date, stating that it was his understanding that, once the defendant concluded its case-inchief on June 29, 2000, the State would be given "a fair opportunity to respond to what [the defendant] has presented."
The State was certainly given sufficient time to muster any evidence it believed was required to rebut the defendant's case, and it chose to introduce the testimony of three witnesses at the subsequent hearing on July 20, 2000. On no occasion thereafter did the State indicate to the district court that it needed more time to secure and present additional rebuttal evidence: the State was silent at the third evidentiary hearing on August 10, 2000, and was again silent even after the district court rendered its judgment on March 20, 2001, finding that the defendant had in fact established a prima facie case of discrimination, which the State failed adequately to rebut. Because there is no indication that the State was not given "a fair opportunity" to secure rebuttal evidence from its own expert witness or any other source, the State is hard-pressed at this late date to argue detrimental reliance under these circumstances. Consequently, its attempt on appeal, just days before oral argument, to introduce into the record, by means of a motion to supplement, new rebuttal evidence, in the form of an affidavit and a report prepared by an expert the State only recently hired in December 2001, is to no avail. The State's January 8, 2002 motion to supplement the record was denied by this court immediately preceding oral argument on January 16, 2002, and its argument that the case should be remanded for another evidentiary hearing is similarly without merit.[14]
We turn next to the State's contention that the defendant failed to establish a prima facie case of discrimination. The State's primary argument, presented in its Assignment of Error No. 1 and Supplemental Assignment of Error No. 2, is that the defendant's expert failed to utilize the proper base population in establishing the degree of under-representation *367 of women and African-Americans selected to serve as grand jury forepersons. The State essentially contends there were two potentially more appropriate groups the defendant should have used as the base population for its comparisons. First, in its original brief, the State asserts that the base group should have been the "eligible" population, that is, those persons in Calcasieu Parish who would have been eligible to serve on a grand jury pursuant to La. Code Crim. Proc. art. 401.[15] Citing the dissent in Castaneda v. Partida, the State maintains that Calcasieu Parish residents who do not meet the qualifications should have been removed from the census totals in the formulation of the base group. Second, the State asserts in its supplemental brief that the defendant should have compared the percentages of African-Americans and women in the entire grand jury venire over a substantial length of time to the proportion of those respective groups called to serve as forepersons over that time frame. Instead, the State argues, the defendant's expert witness compared the racial and gender composition of the grand jury itself to the percentages of African-Americans and women who had been selected to serve as grand jury forepersons. The State argues that Dr. Devine's methodology, even though his report mentions gross population statistics, is contrary to that mandated by Castaneda v. Partida, Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), and State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675, cert denied, 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001). The State additionally argues that the entire grand jury venire over the time period is more relevant for comparison purposes than the actual grand juries, because the grand jury venire was the group from which the forepersons were selected, as was provided for in La.Code Crim. Proc. Art. 413(B) prior to its amendment in 1999. The State thus argues that the defendant's expert's methodology failed to take into account the actual selection procedure used by the trial courts at the time of the defendant's indictment.
Thus, it appears from the State's arguments that it believes the correct base population to use in showing under-representation in the selection of grand jury forepersons is either the general census numbers for Calcasieu Parish minus those not qualified to serve as a juror pursuant to Article 401, i.e., the total eligible population of the parish, or the entire grand jury venire, i.e., the pool of persons called to serve as grand jurors, from which the foreperson was selected by the judge and which would have been pre-qualified pursuant to Article 408. The State seemingly argues that, whichever of the two groups the legally proper base should be, the defendant's expert used neither, instead choosing a different, impermissible one.[16]
*368 Our review of the jurisprudence suggests that the determination of which "total population" group is more relevant to proving the under-representation of a particular minority in, say, the grand jury venire, the grand jury, or the grand jury forepersons may depend upon the relationship between the base group and the target group, i.e., the group in which the under-representation is allegedly manifest. In the seminal Supreme Court case on the issue, Castaneda v. Partida, a majority of the Supreme Court sanctioned the defendant's use of general gross population statistics over so-called "eligible" population statistics. There, the defendant established an apparent 40% discrepancy between the percentage of Mexican-Americans in the total population of Hidalgo County, Texas, and the percentage on the grand jury lists, i.e., the persons summoned for grand jury service. The State of Texas argued that differences in education, for example, might explain the discrepancy between the general population and those called to serve as grand jurors, because literacy was one qualification for jury service in Texas. The dissent in Castaneda apparently agreed, contending that the eligible population, rather than the gross population, would provide the relevant starting point. Castaneda, 430 U.S. at 504, 97 S.Ct. at 1285, Burger, C.J., dissenting. The Castaneda majority, however, found that, if there were any merit to the government's contention that the under-representation was not as significant as the defendant had shown, it was the government's burden to rebut the defendant's prima facie case of discrimination and to produce evidence as to how many of those listed in the census figures with Mexican-American names were otherwise unqualified for reasons such as lack of citizenship or illiteracy. Castaneda v. Partida, 430 U.S. at 498, 97 S.Ct. at 1282.
The Supreme Court majority in Castaneda provided additional rationale for accepting the gross population figures over eligible population statistics in that case. The majority observed that, under the Texas method of selecting grand jurors, juror qualifications are not tested until the persons on the list appear in the district court. Accordingly, the court reasoned, before the persons were qualified, "assuming an unbiased selection procedure, persons of all educational characteristics should appear on the [grand jury] list." Castaneda, 430 U.S. at 482 n. 8, 97 S.Ct. at 1276 n. 8. Thus, while eligible population statistics might have provided a race-neutral explanation for any discrepancy between the percentage of Mexican-Americans on the grand jury lists and the percentage of Mexican-Americans who actually were qualified and then served on the grand juries, the general population statistics, as the majority recognized, highlighted a significant and unexplained discrepancy in the system that eligible population statistics might not have revealed.
The concept of the "eligible population" was acknowledged in Alexander v. Louisiana, supra; however, the Supreme Court spoke of the "eligible population" in the broadest sense, i.e., those citizens eighteen years of age or older. In Louisiana, it is reasonably argued that a truly representative eligible population class would factor in not only age, presently eighteen years or older, but also literacy, residency in the parish for more than one year, and good character, that is, the absence of prior felony convictions. See La.Code Crim. *369 Proc. art. 401. Notably, unlike the Texas jury selection procedures reviewed in Castaneda, the qualifications of individuals called to serve as jurors in Louisiana are determined before their names are placed on the general venire lists. See La.Code Crim. Proc. arts. 408 and 409. This prequalification of venire members, according to neutral criteria, does arguably suggest that eligible population statistics might generally be more precise than gross population statistics in calculating the degree of under-representation of minorities in the grand jury venire, for example. In this vein, our courts of appeal have generally required that eligible population statistics be presented to prove jury discrimination claims. See, e.g., State v. Young, 569 So.2d 570 (La.App. 1st Cir.1990), writ denied, 575 So.2d 386 (La.1991); State v. Guillory, 97-0179 (La.App. 3 Cir. 3/11/98), 715 So.2d 400 (relying on Young), writ denied, 98-0955 (La.10/9/98), 726 So.2d 17; State v. Thibodeaux, 97-1636 (La.App. 3 Cir. 11/18/98), 728 So.2d 416 (same), writ denied, 98-3131 (La.5/7/99), 741 So.2d 27.
In State v. Young, for example, the racial and gender composition of the general or grand jury venire was not available. Census data showed that 31.3% of East Baton Rouge Parish was African-American, and the state stipulated that from 1978 to 1988 only 6.6% of grand jury forepersons were African-American. Based on this information, the motion to quash the indictment was denied. On appeal, the First Circuit upheld that decision, stating that "the defendant failed to show the percentage of minority persons in the general or grand jury venires, or the percentage of qualified minority persons in the general population." 569 So.2d at 576. The First Circuit reasoned that, because the general venire in East Baton Rouge Parish is composed of "qualified" persons drawn from a random list of registered voters and licensed drivers in that parish, the total percentage of a particular minority in the general population does not have a "direct bearing on the make-up of the general venire, from which the grand jury venire is randomly drawn, and the grand jury foreman is selected." Id., 569 So.2d at 575.
The instant case, however, differs from these Louisiana court of appeal cases, because it presents a unique set of facts. Here, the defendant was able to present not only evidence of the racial and gender composition of the gross or general population for 1970, 1980, and 1990, but also evidence of the racial composition of voter registration rolls in 1988 and the racial and gender composition of the grand jurors who actually served during the period from 1975 to 1994.[17] Two factors lead us to accept the defendant's statistical evidence as sufficient to prove the degree of under-representation in the target group of grand jury forepersons selected by the judge from the grand jury venire. First, common sense tells us that the group of grand jurors who actually served is, by virtue of La. Code Crim. Proc. art. 413(B), a randomly-selected sample or subset of *370 the total grand jury venire, the population group the State contends is an appropriate base population. Second, the fact that the percentages of African-Americans and women in the general or gross population, among registered voters, and in the group of persons who actually served on the grand juries are all statistically nearly identical leads us to believe that the percentages of these classes in either the eligible population or the total grand jury venire for the relevant period would not be significantly statistically different. In a statistical sense, then, the base group used by the defendant here, that is, the actual grand jurors randomly selected from the grand jury venire from 1975 through 1994, to show under-representation in the target group of grand jury forepersons is equivalent to the base group advocated by the State, the grand jury venire itself, to show under-representation in the target group of grand jury forepersons. Consequently, the defendant in this case has essentially produced the evidence the State says he should have produced.
The State, though it belatedly (in its supplemental brief) attacks for the first time on appeal the accuracy of some of the defendant's data, after initially stipulating in the district court to the data gathered and introduced by the defendant, has provided no evidence to suggest that the percentages of African-Americans and women in the eligible population or the total grand jury venire would be significantly different statistically than that in the group or subset of actual grand jurors randomly selected from the grand jury venire. Consequently, we find that the combination of gross population statistics, voter registration rolls, and a profile of jurors who actually sat on grand juries that convened over a period of almost 20 years provided the district court with a reliable measure for computing on the basis of absolute disparities the degree of under-representation of women and African-Americans in the position of foreperson on grand juries in Calcasieu Parish and for drawing an inference of discriminatory intent therefrom.
Lastly, we address the State's contention that the district court erred in finding that the State had failed to rebut successfully the defendant's prima facie case of discrimination. The State contends that the testimony of the appointing judge was sufficient to rebut the presumption of intentional discrimination established by the defense. Citing United States v. Jenison, 485 F.Supp. 655 (S.D.Fla.1979), and United States v. Holman, 510 F.Supp. 1175 (N.D.Fla.1981), aff'd, 680 F.2d 1340 (11th Cir.1982), the State argues that the appointing judge's statement that he chose Mr. Hicks because he thought the latter "was a good, responsible, stable citizen" negates any claim that racial or gender discrimination played a role in the selection of the foreperson of the grand jury that indicted the defendant. The State maintains that Mr. Hicks was selected for other than racial or gender reasons. The State also contends that discrimination in the selection of the grand jury foreperson does not violate the defendant's due process rights. Finally, the State argues that, because there has been no showing of purposeful discrimination against African-Americans or women, the defendant has failed to establish that a particular group has been singled out for different treatment.
We are bound by the primary holding of Campbell v. Louisiana that a white defendant has standing to challenge the exclusion of African-Americans as grand jurors and grand jury forepersons on equal protection and due process grounds. Id., 523 U.S. at 392-393, 118 S.Ct. at 1420. The exclusion of grand and petit jurors on the basis of race violates *371 the jurors' equal protection rights. Id., 523 U.S. at 398, 118 S.Ct. at 1423, citing Carter v. Jury Com. of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). The Supreme Court in Campbell reasoned that, regardless of skin color, an accused suffers a "significant injury in fact when the composition of the grand jury is tainted by racial discrimination." Id., 523 U.S. at 398, 118 S.Ct. at 1423, citing Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The remedy for intentional discrimination in the selection and composition of grand juries, whether resulting in the complete exclusion of an identifiable group or substantial under-representation of that group, is to vacate the conviction and quash the indictment returned by the unconstitutionally constituted grand jury. Vasquez v. Hillery, 474 U.S. 254, 262, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986); Rose v. Mitchell, 443 U.S. at 551-52, 99 S.Ct. at 2997-98; Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); Johnson v. Puckett, 929 F.2d 1067, 1071 (5th Cir.), cert. denied, 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991).
The district court in this case applied the correct law to the defendant's motion to quash the indictment. As the district court noted, the Supreme Court set out a three-part test in Castaneda v. Partida, supra. To demonstrate an equal protection violation in the context of grand jury selection, a defendant must establish a prima facie case of purposeful discrimination by showing: (1) that those discriminated against belong to a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied; (2) that the degree of under-representation must be proved "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) that the selection procedure is "susceptible of abuse or is not racially neutral" so as to support the presumption of discrimination raised by the statistical showing. Castaneda v. Partida, 430 U.S. at 494-95, 97 S.Ct. at 1280; see also State v. Cosey, 97-2020, p. 10, 779 So.2d at 682. This court has previously acknowledged that blacks and women are identifiable groups capable of being singled out for disparate treatment. State v. Cosey, 97-2020, p. 10, 779 So.2d at 682, citing J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). This court has also recognized that, at the time the defendant was indicted, Louisiana's procedure for selecting grand jury forepersons was unquestionably subject to abuse according to subjective criteria that may include race and gender. Cosey, 97-2020, pp. 10-11, 779 So.2d at 682-83, citing Campbell v. Louisiana, supra; Johnson v. Puckett, supra.
Here, the degree of under-representation alleged by the defendant is within the range accepted by the jurisprudence as sufficient to support a prima facie case of discrimination. Specifically, African-Americans comprised 21.6% to 22.9% of the pool of grand jurors randomly selected from the venire but only 6.1% to 7% of the grand jury forepersons selected by the judge from the venire, amounting to an absolute disparity ranging from 15.5% to 15.9%. With respect to women who made up 52.4% of the pool of actual grand jurors randomly selected from the venire, only 27.9% of the women were forepersons selected by the judge from the venire, thereby resulting in an absolute disparity of 25.4%. These absolute disparities were sufficient statistically to establish the degree of under-representation from which the district court could find that the defendant had established a prima facie case of intentional discrimination. Compare Castaneda *372 v. Partida, 430 U.S. at 495-96, 97 S.Ct. at 1280-1281 (prima facie case shown where Mexican-Americans comprised 79.1% of the county's population but only 39% of those called for grand jury service)(absolute disparity of 40.1%); Turner v. Fouche, supra (blacks comprised 60% of the general population but 37% of the grand jury lists)(absolute disparity of 23%); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)(blacks comprised 27.1% of the tax digest but only 9.1% of the grand jury venire) (absolute disparity of 18%); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967)(19.7% of blacks on tax lists but only 5% of grand jury lists)(absolute disparity of 14.7%). The inference of discriminatory intent arising from these disparities with regard to the selection of grand jury forepersons is not dispelled by the presence of other minority members on the panel in rough proportion to their percentage in the general population. See Cassell v. Texas, 339 U.S. at 287, 70 S.Ct. at 632. Given this evidence in the record, we discern no manifest error in the district court's conclusion that the defendant established a prima facie case of purposeful discrimination under the three-part test of Castaneda v. Partida.
Once the defendant has shown under-representation of the particular group, he has made out a prima facie case of discriminatory purpose, and the burden of proof then shifts to the state to rebut the case. Castaneda v. Partida, 430 U.S. at 495, 97 S.Ct. at 1280. Through the completion of the evidentiary hearing in the district court, and until the State filed its supplemental brief in this court one week before oral argument, the defendant's data and statistics went unrefuted. Rather than challenge the numerical and statistical evidence in the district court, and thereby alert the district court judge to any alleged unreliability in the defendant's evidence, the State called the appointing judge, whose testimony did little to rebut the defendant's prima facie case. Instead, the appointing judge's testimony enhanced the defendant's case by exposing the selection process he used, which had resulted in his not having chosen any African-Americans or women during his selection of grand jury forepersons, even though a number of minority persons were eligible. The State's case, which consisted mainly of the appointing judge's denial of discrimination in the selection of Mr. Hicks as the foreperson, failed to rebut the defendant's statistical and testimonial evidence.
The Supreme Court has said that "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." Castaneda v. Partida, 430 U.S. at 494, 97 S.Ct. at 1280. The fact that the appointing judge selected only people that he knew or thought he knew, combined with his admission that he knew primarily white persons, and his testimony that, of the people he knew on the grand jury list, the overwhelming majority were men, indicates that the process employed by the judge had the effect of limiting the selection of the grand jury foreperson to a group made up predominately of white men. Thus, African-Americans and women were intentionally, even if without malice, excluded from the pool of potential grand jury forepersons. In the absence of other evidence, we cannot say that this particular procedure utilized by the judge was based solely on objective criteria related to the functions of a grand jury foreperson. Moreover, as we have previously observed, it was a selection process susceptible of abuse.
In a factually comparable case, the Supreme Court found proof of intentional exclusion of minorities. In Cassell v. *373 Texas, supra, the jury commissioners, like the appointing judge here, testified that they chose prospective jurors only from those people with whom they were personally acquainted. They also testified that they did not know any black people who were eligible, even though blacks made up a large portion of the population. The Supreme Court said that, in proving discrimination, it is sufficient to have direct evidence based on the statements of the jury commissioners in the very case. The Supreme Court found that the commissioners' statements "prove the intentional exclusion that is discrimination in violation of petitioner's constitutional rights." Cassell, 339 U.S. at 290, 70 S.Ct. at 633, 94 L.Ed.2d at 849.
Given the paucity of the State's evidence in rebuttal, and the strength of the defendant's unrefuted statistical evidence, we cannot reasonably conclude that the district court abused its discretion in granting the defendant's motion to quash the indictment. Accordingly, we affirm the district court's ruling.

DECREE
For the reasons set forth above, we affirm the district court's ruling, which granted the defendant's motion to quash the indictment, effectively upsetting the defendant's conviction, and ordered further proceedings.
AFFIRMED.
JOHNSON, J., concurs and assigns reasons.
VICTORY, J., concurs and assigns additional reasons.
WEIMER, J., concurs and assigns reasons.
TRAYLOR, J., concurs for reasons assigned by WEIMER, J.
JOHNSON, J., concurs and assigns reasons.
This court is faced with the moral and legal implications of 49 years of discrimination in the selection of grand jury forepersons in Calcasieu Parish. How do we certify that the Louisiana judicial system is fundamentally fair, where there is compelling evidence of racial and gender discrimination?
It is well settled since Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) that a white male has standing to raise the issue of racial and gender discrimination in selection of the grand jury foreperson. Mr. Langley, in fact, presented compelling proof that a total of 49 grand juries which sat in Calcasieu Parish from March 12, 1972 to June 23, 1994 discriminated against blacks and women in the selection of grand jury forepersons.
The evidence showed the probability of randomly selecting only 3 African-Americans out of 49 as grand jury foreperson was 1 in 392, since African-Americans made up 21.6% of the grand jury pool. Women comprised 52.4% of the pool of grand jurors randomly selected since 1975, but were selected foreperson only 12 times out of 43, a statistical probability of 1 in 1502.[1]
Having concluded that we must set aside Mr. Langley's conviction of first degree murder and death sentence, I would go even further and conclude that the entire work of this illegally constituted grand jury must be set aside.
This special grand jury convened on April 5, 1991, and sat until March of 1992. It had no black members and a white male *374 as foreperson. During this time, the grand jury returned 300 true bills. How can we deny relief to others indicted by this same illegal grand jury? Prior to 1999, the district judge selected all grand jury forepersons. After Campbell, the Louisiana legislature amended La.C.Cr.P. art. 413 to remove the power of selection from the trial judge in favor of random selection. A state cannot subject a defendant to indictment by a grand jury that has been selected in a discriminatory manner. To do so violates the defendant's equal protection rights under the Fourteenth Amendment. Peters v. Kiff, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).
How has this Court responded to claims by defendants that their rights were violated under the Fourteenth Amendment Due Process Clause? We have systematically denied relief to these defendants by relying on La.C.Cr. P. art. 841, which requires a defendant to move before trial to quash the indictment. We have held that failure to so move, results in waiver of any claims of discrimination in the selection of grand jury foreperson. Federal equal protection claims arising out of the selection and composition of grand juries in Louisiana have remained subject to this state's settled procedural rule that a defendant must assert the challenge in a motion to quash filed before trial. Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976). See Deloch v. Whitley, 96-1901 (La.11/22/96), 684 So.2d 349 ("Counsel must assert the equal protection claim in a pre-trial motion to quash or waive any complaint in that regard"); State v. Dillard, 320 So.2d 116, 120 (La. 1975) (failure to file motion to quash before trial waives any challenge to the grand jury); State v. White, 193 La. 775, 786, 192 So. 345, 348 (1938) (same); cf. Lindsey v. Whitley, 94-1559 (La.3/17/95), 651 So.2d 264 (court denies writs when even capital convict failed to raise before trial issue of discrimination in grand jury foreman selection process).
The inequitable result of this procedural bar is shown in the following scenario: Where two defendants, both aggrieved by the violation of their constitutional right to be indicted by a legally constituted grand jury, one defendant is entitled to have his conviction overturned because his counsel timely filed a motion to quash, while the other defendant is not afforded such relief due to the ineffective assistance of his counsel in failing to timely file the motion to quash. Thus, a defendant's remedy against a violation of his constitutional right is contingent upon the effectiveness of his counsel. In some cases, we have attributed the failure to file the motion to quash, that in any case would likely lead only to re-indictment, to "trial strategy." See State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, 577 (counsel's decisions as to which motions to file form a part of trial strategy); State v. Smith, 94-0621 (La.App. 4 Cir. 12/15/94); 647 So.2d 1321, rev'd on other grounds, 95-0061 (La.7/2/96); 676 So.2d 1068.
What a cruel irony! Mr. Langley, a white male, has been afforded relief because his counsel timely filed a motion to quash the illegally constituted indictment based on racial and gender discrimination, while many African-Americans who were indicted by this same illegally constituted grand jury remain incarcerated, and some perhaps sit on death row. Louisiana has an adult prison population that is 76% African-American.[2] Many of these criminal *375 defendants, too numerous to detail in this document, were indicted by grand juries that were illegally constituted because of racial and gender discrimination in the selection of grand jury forepersons. They will not have the benefit of Campbell and Langley because of the ineffective assistance of their counsel in failing to timely file a pre-trial motion to quash their indictments.
Discrimination in the selection of grand jurors is a "grave constitutional trespass" and it "undermines the structural integrity of the criminal tribunal itself." State v. Cain, 99,2173 (La.App. 1 Cir. 10/26/99), 763 So.2d 1 citing Vasquez v. Hillery, 474 U.S. 254, 262 & 263-64, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986). If a defendant proves systematic exclusion of blacks from the grand jury, the remedy is reversal of the conviction. The error is not subject to harmless error review. Vasquez v. Hillery, 474 U.S. at 263-64, 106 S.Ct. at 623. See also Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999); Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). Thus, the indictments from the 49 unconstitutionally constituted grand juries in this case mandates automatic reversals, not subject to the harmless error analysis and certainly should not be subordinate to a procedural law of this state.
In light of our holding that the grand juries did discriminate, we cannot treat any indictment returned by them as valid. Therefore, the only remedy for this intentional discrimination is to vacate all the convictions and quash the indictments returned by these unconstitutionally constituted grand juries.
VICTORY, J., concurring with additional reasons.
I agree with the excellent concurrence by my colleague Justice Weimer. I write additionally to concur with the view of Justice Thomas (joined by Justice Scalia) in Campbell:
"I fail to understand how the rights of blacks excluded from jury service can be vindicated by letting a white murderer go free."
Fortunately, here, Langley will probably not go free, but will probably be reindicted and retried.
WEIMER, Justice concurs and assigns reasons.
Constrained by controlling precedent of the United States Supreme Court to reluctantly concur in the result reached by the majority, I write separately to express disagreement with the remedy imposed by the United States Supreme Court for discrimination in the selection of the foreperson for the grand jury that indicted Langley. Following Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) and Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the majority is obligated to find that the remedy for intentional discrimination in the selection and composition of grand juries is to vacate the conviction and quash the indictment returned by the unconstitutionally constituted grand jury. While this is clearly the result mandated by the United States Supreme Court, whose rulings on federal constitutional principles we are bound to follow, I am of the opinion that the remedy in this case imposes a greater societal injustice than the ill it is designed to ameliorate. Recognizing that discrimination at any stage of a criminal proceeding is odious and cannot under any circumstances be condoned, I nevertheless believe that the heavy societal cost entailed in the reversal of Langley's conviction is unjustified in this instance, especially considering (1) that Langley fails to demonstrate that he suffered any prejudice *376 as a result of the improperly constituted grand jury and (2) that the practice of discrimination in the selection of grand jury forepersons in Calcasieu Parish (and indeed in the entire State of Louisiana) has been eradicated by virtue of the amendment of La.C.Cr.P. art. 413, eroding the deterrent effect of the drastic corrective measures imposed.
Adhering to what I recognize to be the minority view in the United States Supreme Court on this issue, I would nevertheless urge the adoption of the harmless-error rule for claims of grand jury discrimination. The Supreme Court has thus far refused to adopt such a rule on the finding that "[s]election of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." Rose v. Mitchell, 443 U.S. at 555-556, 99 S.Ct. at 3000. However, as Justice Powell points out in his dissent in Vasquez v. Hillery, the Court has never adequately explained why grand jury discrimination "affects the `integrity of the judicial process' to a greater extent than the deprivation of equally vital constitutional rights, nor why it is exempt from a prejudice requirement while other constitutional errors are not." 474 U.S. at 271, 106 S.Ct. at 627. Indeed, every constitutional error may be said to raise questions as to the "appearance of justice" and the "integrity of the judicial process." As Justice Powell notes:
Grand jury discrimination is a serious violation of our constitutional order, but so also are the deprivations of rights guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments to which we have applied harmless-error analysis or an analogous prejudice requirement. Moreover, grand jury discrimination occurs prior to trial, while the asserted constitutional violations in most of the [cases applying harmless-error analysis] occurred during trial.
Vasquez v. Hillery, 474 U.S. at 271, 106 S.Ct. at 627. There does not seem to be a coherent rationale for the Supreme Court's disparate handling of claims of grand jury discrimination other than the societal goal of eradicating discrimination. However, there must be means of vindicating this important interest short of reversing a defendant's otherwise constitutionally valid conviction. Clearly, there is little doubt that a member of the venire who was discriminatorily excluded from grand jury service would be dismayed to learn that the defendant used his or her constitutional rights as a means to overturn this defendant's conviction.
I am convinced that there was no intentional discrimination from the standpoint anyone was purposely excluded based on race or gender. Thus, the statistics which reflect an under representation of certain segments of society were not the result of intentional bias, but rather a function of judges choosing people they believed were qualified because they knew the person. Although the net result may be a statistical under representation based on race and gender, purposeful intentional bias and prejudice has not been established.
In the instant case, Langley makes no allegation that the composition of his trial jury was affected by the discrimination in the selection of the foreperson of his grand jury. The properly constituted trial jury's verdict of guilty beyond a reasonable doubt could thus in no way be seen to have been affected by the composition of the grand jury. Given the lack of prejudice in fact suffered by Langley, the remedy imposed reversal of his convictionseems disproportionate to the ill it seeks to cure, especially considering that the legislature has seen fit to amend the procedure for selecting grand jury forepersons to remove *377 the constitutional infirmity, negating the deterrent effect such a prophylactic measure would serve. Therefore, if writing on a clean slate, I would apply a harmlesserror analysis to affirm Langley's conviction and sentence. However, being bound by the decisions of the U.S. Supreme Court, I am forced to concur.
NOTES
[*] Retired Justice Walter F. Marcus, Jr., assigned as Justice ad hoc, sitting for Associate Justice Jeannette Theriot Knoll, recused.
[1] Although the defendant contends this Court lacks jurisdiction over the State's appeal, La. Code Crim. Proc. art. 913 explicitly provides that "[a]n appeal by the state suspends the ruling or judgment from which the appeal is taken, except when the ruling or judgment requires the release of the defendant." The granting of a motion to quash on grounds of purposeful racial discrimination in the selection of the grand jury that indicted the defendant does not require the release or discharge of the defendant. See La.Code Crim. Proc. art. 538. The State's appeal in this case under La. Code Crim. Proc. art. 912(B)(1) has, therefore, suspended the judgment of the district court sustaining the motion to quash and setting aside the defendant's conviction and sentence. This case remains one in which the defendant has been convicted of a capital offense and a sentence of death has actually been imposed. The State's appeal therefore properly lies within the jurisdiction of this Court as a matter of La. Const. art. 5, § 5(D)(2).
[2] Prior to its amendment in 1999, Article 413(B) provided in pertinent part:

B. In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury.
In response to the United States Supreme Court's decision in Campbell v. Louisiana, the legislature amended La. Code Crim. Proc. art. 413(B) by La. Acts 1999, No. 984, § 1, to remove the selection power from the district court judge, in favor of a random selection of the grand jury foreperson. The article was further amended by La. Acts 2001, No. 281, § 1, to include Orleans Parish and to delete Paragraph C of the article. The article now provides in pertinent part:
B. The sheriff, or in Orleans Parish, the jury commissioner shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury. * * * The court shall cause a random selection to be made of one person from the impaneled grand jury to serve as foreman of the grand jury.
We note that the words "remaining" and "to complete" appear to be inconsequential vestiges of the former article.
[3] The race and gender composition was unknown for the grand juries empaneled on March 27, 1972, September 18, 1972, and March 12, 1973.
[4] The number 526 was derived from 46 grand juries times 11 jurors per grand jury, plus 10 grand juries times 2 alternate jurors per grand jury, for a total of 526.
[5] The witness explained that quantitative sociology, which much of American sociology is today, is the numerically or statistically based study of social phenomena, distinguished from an older tradition in sociology of primary field methods. Dr. Devine stated that most of the methods used in quantitative sociology come from the fields of biology and applied statistics.
[6] The first names of the three grand jurors were Bernice, Virginia, and Day Lynn. However, Dr. Devine made calculations by assuming these jurors were white males. Though described as the "most conservative" by the defense, such an assumption is clearly in the defendant's favor. Given the nature of the analysis here, the assumption least favorable to the defense would have been to assume that the three "missing" jurors were African-American women.
[7] The three omitted grand juries were empaneled on October 4, 1973, March 21, 1974, and September 30, 1974.
[8] The number 33 was calculated from 3 grand juries times 11 jurors per grand jury; there were no alternates empaneled on these three grand juries.
[9] Dr. Devine referred to the statistical methodology as binomial distribution. Binomial distributions have long been associated with jury discrimination issues. See Castaneda v. Partida, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); see also Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv. L.Rev. 358, 353-356 (1966) (discussing jury venire selection between Caucasian and African-Americans as a series of Bernoulli trials in which, as in a series of coin flips, there are only two choices, the result of each selection is independent of the other selection, and the probability of selecting one race or another remains constant throughout the selection process).
[10] In argument, the defendant cites the probability of randomly selecting just 12 women out of a total of 49 grand jury forepersons, which Dr. Devine calculated as 1 in 3308, given that women comprised 52.4% of the pool of grand jurors randomly selected to serve. The defendant uses this probability, 1 in 3308, to compare to the probability that an American will contract cancer from eating a peanut butter sandwich everyday, or 1 in 5000. However, given that women were exempted from service for the first six grand juries in the time period under scrutiny, the 12 out of 43 probability, or 1 in 1502, is the more appropriate statistic to consider.
[11] In addition to the selection method, the district court also noted the "unique aspect" of the instant case, in that there were two concurrent grand juries operating at the time of the defendant's indictment: the regularly impaneled jury had a female foreperson, while the special grand jury that indicted the defendant had a male foreperson. The district court opined that the State had created a situation in which it could select from two grand juries, regardless of the judge's decision in selecting the foreperson member of the jury. Thus, the court reasoned that, even if no bias were shown in the selection of one of the forepersons, such a positive fact would be negated by the prosecution's choice of grand jury.

The trial court discounted Ms. Allemond's testimony, which was presented by the State to show that it had not "rigged the system" to choose a grand jury with a white male foreperson when a grand jury with a white female foreperson was available at the same time. The district court noted that, under State v. Simpson, 551 So.2d 1303, 1304 (La.1989), there need be no proof of actual impropriety; instead, the issue is whether the system vests the district attorney with the power to choose the judge to whom a particular case is assigned. The court observed that, while the time period from the date of the instant offense to the defendant's indictment amounted to fourteen days, the average time period for indictments returned during the same time period ranged from a low of 46 days to a high of 671 days. Under these circumstances, the district court found, "the state's suggestion that Mr. Langley's case was brought routinely before the first available grand jury is highly improbable," and further concluded that the defendant's case "seemed to be rushed." Although the State gives an explanation in its supplemental brief for the two grand juries and the timing of bringing this case before the special grand jury, there was no evidence introduced by the State to substantiate the facts alleged in brief.
[12] Of the 85 people called for grand jury service, the appointing judge thought he knew only eight people, mostly white males and mostly from within the judge's same social circle. The lone woman of the eight people was a woman the judge had met but did not really know. In the district court's view, the fact that 87.5% of the people the judge knew were male was "a strong indicator that the process of selecting the foreperson was not gender-neutral." Slip op., p. 8.
[13] The State also raised this issue in its original brief.
[14] The State had its chance in the district court to introduce any admissible evidence it cared to present. Now that the record has been made up, it is not to be expanded on appeal by the State filing a motion to supplement one week prior to oral argument. In State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675, 684, 675, we similarly rebuffed a defendant's effort on appeal to supplement the record with evidence that was not introduced in the district court. However, this is not to say that, should the State be required to defend against future motions to quash in other cases in this jurisdiction, the State would be precluded from introducing the evidence it believes will be necessary to rebuff the challenge to the indictment in such other case or cases.
[15] Article 401 provides for the general qualification of jurors, and states in pertinent part:

A. In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service.
(2) Be at least eighteen years of age.
(3) Be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language.
(4) Not be under interdiction or incapable of serving as a juror because of a mental or physical infirmity, provided that no person shall be deemed incompetent solely because of the loss of hearing in any degree.
(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned.
[16] The State concedes in its original brief, at page 11, that African-Americans and women have been under-represented as forepersons of grand juries, but it maintains that the defendant has failed to prove any purposeful discrimination against these groups at any time.
[17] According to census figures for Calcasieu Parish for the years 1970, 1980, and 1990, the percentage of African-Americans ranged from 21.7% to 23.2%. In December 1988, African-Americans comprised 20.3% of registered voters in Calcasieu Parish. And during the period from 1975 to 1994, African-Americans comprised 22.9% of the 490 (or 21.6% of the 523 since 1973) grand jurors who were randomly selected from the grand jury venire to serve. As the defendant's expert noted, these percentages correspond fairly well.

According to the same census figures for 1970, 1980, and 1990, the percentage of women ranged from 51% to 51.2% of the general population. During the period from 1975 to 1994, women comprised 52.4% of the 490 grand jurors who were randomly selected from the grand jury venire to serve. Again, these percentages correspond as well.
[1] Prior to 1975, women were excluded from jury service.
[2] Statistic derived from a Demographic Profiles of the Adult Correctional Population (January 1, 2002), prepared by Office of Management & Finance Information Services, Louisiana Department of Public Safety and Corrections.